641 F.2d 1128
 Charles J. PORTER, Plaintiff-Appellee,
v.
AMERICAN OPTICAL CORP. and Hartford Accident & Indemnity
Company, Defendants-Appellants,
v.
AETNA LIFE & CASUALTY INSURANCE CO., and Continental
Insurance Co., Defendants-Appellees,
American Motorists Ins. Co., Intervenor-Appellee.
 No. 78-1953.
 United States Court of Appeals,
Fifth Circuit.
 April 8, 1981.
 
 Paul V. Cassisa, Metairie, La., Frank J. Peragine, New Orleans, La., for defendants-appellants.
 M. H. Gertler, James H. Looney, New Orleans, La., for Charles J. Porter.
 Allen R. Fontenot, New Orleans, La., for Aetna Ins.
 W. K. Christovich, New Orleans, La., for Continental Ins.
 Thomas E. Betz, Gallagher, Sharp, Fulton, Norman & Mollison, Michael R. Gallagher, Alan M. Petrov, Cleveland, Ohio, for Insurance Co. of North America, amicus curiae.
 Richard A. Epstein, Chicago, Ill., Ben Louis Day, Baton Rouge, La., for Federal Ins. Co. and Fireman's Ins. Co., amicus curiae.
 Lewis Herman, New York City, for Philip Alan Froude and Leslie Eric Kemp, amicus curiae.
 Jerold Oshinsky, Anderson, Russell, Kill & Olick, New York City, Sidney L. Shushan, New Orleans, La., for Keene Corp., amicus curiae.
 Mary Ann D'Amato, Mendes & Mount, New York City, for John Basil, Thomas Bird and certain underwriters, amicus curiae.
 Gerald V. Weigle, Jr., Cincinnati, Ohio, amicus curiae.
 Thomas M. Nosewicz, New Orleans, La., Christopher C. Mansfield, Charles R. Parrott, Boston, Mass., for Liberty Mut. Ins. Co., amicus curiae.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before COLEMAN, REAVLEY and ANDERSON, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 The gravity of this case for the parties concerned, including the novelty of the issues presented with reference to insurance coverage, has inspired prolonged consideration and reconsideration, to the end that an appropriate disposition might be made.
 
 I. The Nature of the Litigation
 
 2
 This diversity action was originally brought by Charles J. Porter, now deceased, for damages resulting from asbestosis contracted while he was an employee of the National Gypsum Company in New Orleans and while Porter was supposed to have had the protection of respirator and filter apparatus supplied by the American Optical Corporation (American Optical). Porter subsequently died from his illness and the members of his family were substituted as parties plaintiff.
 
 
 3
 The primary defendant was American Optical. Also joined as defendants were three insurance companies which, at various times, had insured American Optical (not National Gypsum) during most of Porter's employment and illness: Aetna Casualty and Surety Company (Aetna), Hartford Accident and Indemnity Company (Hartford), and Continental Insurance Company (Continental).
 
 
 4
 By its verdict, the jury found the American Optical respirator and filter apparatus to have been defective and a proximate cause of Porter's resulting illness and death. Damages were awarded in the sum of $155,000.
 
 
 5
 Thereafter, in adjudicating the liability of the insurance companies the District Court held that Hartford alone provided the insurance coverage for the American Optical loss. The claims against Aetna and Continental were dismissed.
 
 
 6
 Consequently, we are now presented with "two appeals in one". American Optical appeals its primary liability. Hartford appeals the determination of its insurance coverage.
 
 
 7
 We affirm the judgment against American Optical.
 
 
 8
 We affirm that part of the judgment which absolved Continental of insurance coverage.
 
 
 9
 We reverse the judgment as to the insurance coverages of Aetna and Hartford.
 
 
 10
 We remand the case for an apportionment of coverage (liability) as between Aetna and Hartford.
 
 
 11
 We hold that the District Court erred when it measured insurance coverage by the "manifestation" standard. Instead, it should have used the "exposure" standard and should accordingly have prorated insurance liability coverage.
 
 II. The Liability of American Optical
 
 12
 Porter instituted this suit in July, 1975. He died about two years later. His wife and daughters have pursued the litigation. On two grounds, the suit sought damages from American Optical for the injury and death of Porter: (1) defective design in the respirator apparatus which was unreasonably dangerous and a proximate cause of the injury to Porter, and (2) negligence of American Optical in failing to warn Porter of dangers inherent in the use of the respirator apparatus, also a proximate cause of the injury in question. In addition to facts relating to the structure of the National Gypsum plant and Porter's working habits and health record, the jury trial consisted largely of expert testimony offered by both sides concerning design and performance of the respirator apparatus and the credibility given to this testimony.
 
 1. The National Gypsum Plant
 
 13
 The National Gypsum Company is a manufacturer of building materials which includes sheetrock, asbestos wall boards, and other asbestos-cement roofing and siding products. The three main ingredients used by National Gypsum in its manufacturing process were cement, asbestos, and silica. These three materials are mixed together, combined with water, molded into a slab form, and left to dry to produce a final product. Because of the dusty atmosphere produced by the handling of these ingredients, National Gypsum required all employees in certain areas to wear protective respirators and filters as a preventive against respiratory ailments. Since 1953, these respirators were supplied to National Gypsum by the American Optical Corporation.[1]
 
 
 14
 The National Gypsum plant in New Orleans consists of two buildings. One is a large building usually referred to as the main plant. The other is a much smaller building located in the rear, adjacent to railroad tracks, referred to as the cement pump house. Cement and silica are delivered to the plant by railroad gondola cars. The cement and silica are pumped out of these cars into storage tanks in the cement pump house, where they are in turn pumped into the main building. The pump in the pump house malfunctions at times and releases a cloud of dust throughout the pump house area.
 
 
 15
 Asbestos is delivered to the plant in packages, is removed from railroad cars by a lift machine, and is stored in a warehouse in the main plant. Consequently, it never passes through the smaller pump house.
 
 
 16
 The main plant has three floors, used for various purposes. Prior to 1972, according to the plant manager, there were no printed signs placed in the plant to indicate working areas that required the use of a respirator. All employees were informed by supervisors and safety personnel of specific areas that required respirator use, however, and were continually checked by the supervisors to ensure the wearing of the breathing apparatus. Outside continuous dusty areas, the employees were to use their own judgment concerning dust levels and the need to wear the respirator. Areas requiring the respirator included the second and third floors of the main plant and the cement pump house. In 1972, after the enactment of the Occupational Safety and Health Act (OSHA), signs were placed at various places in the plant to indicate mandatory respirator areas. These areas included part of the second floor of the main plant where the various particles were mixed together, the third floor, and areas where sawing and sanding operations were conducted. The first floor did not require use of the respirator.
 
 2. Asbestos Particles and Asbestosis
 
 17
 Asbestos is a mineral easily separable into long flexible fibers. Its particles are not of uniform shape or size. The Occupational Safety and Health Administration classifies asbestos fibers by six different types. Each type has a different length, texture, strength, acid resistance, and flexibility.1A The number of small asbestos fibers that will pass through the filter of a respirator, therefore, may be dependent on the particular types of asbestos particles present in the atmosphere of employment.[2]
 
 
 18
 In the working atmosphere of a plant such as National Gypsum, the air is full of minute asbestos dust particles not visible to the eye. While a certain number of the particles are present throughout the plant, the concentration is highest where the asbestos is stored, handled or mixed.[3] Continuous breathing of asbestos-laden air will cause an eventual concentration of the particles in the lung tissue. Once in the lung, the particles cannot be coughed out and remain there permanently. The noxious effect of these rock particles causes the body to set up an inflammation until eventually fibrosis occurs. Through fibrosis the body lays down scar tissue in the lung surrounding the asbestos fibers. With a large concentration of the fibers lodged in the lung cavities, scar tissue eventually replaces most of the healthy lung tissue, disrupting the intake of air into lung air sacs and causing a shortness of breath. A sufficiently high concentration and buildup of the condition will cause death. This process, called asbestosis, can also be a precipitating cause of other illnesses such as emphysema, bronchitis, and pneumonia.
 
 
 19
 Asbestosis is a cumulative and progressive disease. It does not occur overnight after breathing in a substantial number of asbestos particles during the day. Rather, the disease is a culmination of body reaction to the particles inhaled during years of exposure. The disease is slow in nature and may require from ten to twenty years from onset to fully manifest itself. Persons may develop asbestosis long after they have left contact with an asbestos environment. Continuous exposure to asbestos particles, however, prods the disease at a greater rate. Even though the body has begun a reaction to the fibers, inhalation of new fibers adds to the lung inflammation and accelerates injury. Due to this progressive nature, it is generally quite difficult, if not impossible, to assign manifestation of the disease to a specific date.
 
 3. Charles Porter's Employment and Illness
 
 20
 Charles Porter was first employed at National Gypsum in 1950. His early jobs with the plant included clean-up work and stacking sacks of fiber in the main plant. Porter worked around dust in these jobs; however, there is no evidence as to whether he did or did not wear a respirator during this time.
 
 
 21
 Around 1960, Porter began working at the cement pump house and, for about thirteen years, continued in this employment, that is, until 1973. Because of the high concentrations of cement and silica dust, work at the cement pump house required the use of a respirator. Despite this requirement, Porter often failed to wear his respirator.[4] According to his own deposition, Porter wore his mask only when dust levels were high. This often occurred when the railroad gondolas were opened for pumping out silica or cement and when the pump malfunctioned or clogged in some manner. Most of the day he let the respirator hang around his neck.
 
 
 22
 Porter's job during this time also required him to enter the main plant several times every day to change tank valves on the second floor. It is not clear, however, that Porter ever worked in this area without his respirator.
 
 
 23
 Porter was first admitted to a Veterans Administration Hospital in 1970 for a hernia. This admission was not related to any lung or respiratory problems.[5] In June, 1971, Porter was hospitalized for twelve days for evaluation of shortness of breath. He was next admitted to the hospital in April, 1973, for approximately three weeks. The symptoms were soreness in the chest, coughing, deep breathing problems, an increase in breath shortness, and pus. The diagnosis was superimposed pneumonia with some type of chronic obstructive lung disease. Asbestosis was not diagnosed.
 
 
 24
 Porter returned to the hospital in August, 1973. During this admission, the hospital diagnosed possible tuberculosis and instituted drug therapy for this condition. Porter's condition did not improve, however, and continued to progress. During 1973, Porter was reassigned at National Gypsum from his job at the cement pump house to work inside the main plant. His illness was a direct cause of this reassignment. In his new job inside the plant, Porter hauled wet byproduct from mixing machines for recycling purposes. The dust level was lower in this area and respirators were not required for Porter or the machine operators.
 
 
 25
 During 1974, Porter was admitted to the hospital two more times. In April, he was diagnosed as having a ruptured lung. This was treated and treatment also continued for tuberculosis and pneumonia. In September, Porter was again admitted for a possible ruptured lung. While this condition was not found, Porter was treated for a fractured rib. Late in 1974, Porter terminated his job with National Gypsum due to the disability caused by his lung condition.
 
 
 26
 Porter returned to the hospital in January, 1975. He had progressive lung lesions. Because Porter's case was considered puzzling, the hospital staff decided to perform a lung biopsy, which consisted of removing a very small piece of the lung for extensive testing. Testimony by the attendant doctor indicated a fear of an undiagnosed progressive fungus which a biopsy would finally confirm or rule out. The biopsy revealed a strong case of asbestosis. The report described Porter's condition as "fibrosis with fragments of asbestos bodies trapped in the fibrous connective tissue. Asbestos bodies or fragments of asbestos bodies are seen throughout all the sections." The report gave no indication that Porter had silica or cement dust in his lungs.
 
 
 27
 On May 22, 1977, Porter died from his chronic lung condition. The death certificate listed the immediate cause of death as respiratory failure due to chronic obstructive pulmonary disease. Listed as significant conditions contributing to the death were asbestosis, serratia pneumonia, and renal insufficiency. The attendant doctor testified that asbestosis was a significant and major condition leading to death.[6]
 
 
 28
 4. Expert Testimony on Respirator and Filter Performance
 
 
 29
 At the trial Dr. William George was called for the plaintiff as an expert toxicologist. He was not qualified by the Court as an expert in respirator or filter design. Dr. George testified that he had conducted a number of inhalation studies. None prior to his test of the apparatus provided by the plaintiff, however, had involved a respirator device.
 
 
 30
 Dr. George presented the results of an experiment conducted to determine the percentage of asbestos fibers that passed through a sample respirator and filter apparatus similar to that used at National Gypsum. The particular respirator tested and introduced into evidence at trial was labeled R-2000, a single muzzle respirator. The filter tested in the experiment and introduced into evidence at trial was classified as R-17. Both the respirator and filter were obtained by the plaintiff from the American Optical product library which kept samples of all products manufactured by the company. Although the samples used at trial were not the exact ones used by Porter during his employment, several National Gypsum employees testified that they were the type of respirator and filter apparatus used at the plant during Porter's employment.[7] Asbestos dust used in the test was taken from the plant environment.
 
 
 31
 The experiment consisted of an air bag, with an asbestos concentration equal to the environment at National Gypsum, connected to a breathing apparatus that pulled air through to simulate the air flow of a respirating person. The respirator device was attached firmly and taped tightly to a dummy figure of a head and face. An electric fan was used to blow the bag and cause asbestos fibers to fill the air in the bag. Placed in the back of the breathing apparatus was a nylon screen mechanism with small holes fifty microns in size (fifty micrometers by fifty micrometers). This nylon screen would trap all asbestos particles fifty microns and larger in size that passed through the respirator and filter. Based upon comparative air environment studies tabulated before and after the air passed through the filter, Dr. George's results revealed that 9.4-9.5% of the asbestos particles passed through the filter. He explained that this figure was "conservative" since he estimated that as many as 50% of the asbestos particles were less than 50 microns in size and passed unhampered through the nylon screen and out of the system. His more liberal estimate of asbestos particles passing through the filter ranged from 18-20%. During a cross-examination that attacked the design of his experiment and its dissimilarity from normal working conditions at National Gypsum, Dr. George defended the validity of his test procedures.
 
 
 32
 The defendants presented Dr. Bruce Held as an expert in industrial hygiene, filter testing, the establishment of respirator programs for industrial use, and quality control programs for manufacturers in the respirator industry. However, Dr. Held was not qualified as an expert in respirator design.
 
 
 33
 Dr. Held testified about government safety standards and testing in the field of respirators. His comments noted that the Bureau of Mines of the Department of Interior generally tested two types of dust, silica and lead dust, out of the thousands of dust types found in the environment. These two types were representative since they were different in shape and texture and generally were harder to filter out than rod-shaped asbestos particles. He stated that filters had to have a 98% or greater efficiency rate to be approved by the government. All the filters in use at National Gypsum, including the R-17 filters, had approval from the Bureau of Mines. The testing by the Bureau of Mines, however, did not involve asbestos dust. Dr. Held added that National Gypsum maintained a poor respirator-safety program and failed to follow established standards.[8]
 
 
 34
 Dr. Held also attacked the validity of the experiment conducted by Dr. George. Inaccuracies pointed out included the use of an old respirator and filter that may have deteriorated in condition over time, therefore permitting leakage of asbestos particles, and the use of the fan, which may have forced particles through the filter, thereby failing to duplicate actual conditions. Dr. Held also criticized the dust concentration and a failure to simulate the proper inhale-exhale method of breathing. On cross-examination, however, Dr. Held stated that he had no personal knowledge whether the R-17 filter used in the experiment was, in fact, in a deteriorated state due to its age. He also admitted that he had never compared the passing of asbestos particles with silica particles.
 
 
 35
 Both the plaintiff and the defendants presented additional expert witnesses to support the viewpoint of their main experts. The plaintiff had Benjamin Lehman, an expert mechanical engineer with experience in testing large, commercial filter systems, who testified that Dr. George's experiment was valid. Lehman commented that filter efficiency for asbestos dust could not be tested properly by using silica dust due to the difference in the shape and structure of the particles. In addition, he knew of no evidence where either the Bureau of Mines or American Optical had tested filters using asbestos dust. He noted that information was available to regulatory agencies to indicate a need for better testing of various dusts. Lehman concluded by noting that the R-17 filter tested for trial did not appear to have significant wear and the respirator valves looked like ones found in a new device.
 
 
 36
 Dr. Peter Magnante, an expert in filter testing and design and a mechanical engineer, testified for the defendants that it was not necessary to test the R-17 filter with asbestos to establish a proper efficiency level. In his opinion, silica was a "worse case test" for filter testing. He also noted that six to eight different types of filters could be used in an R-2000 respirator. His testimony revealed that National Gypsum purchased R-17, R-25, and R-90 filters for use in the respirator. He added, however, that the R-17 filter had a different configuration and was designed for catching smaller particles than the R-25 filter. Dr. Magnante could not find any defects in the R-17 filter upon cursory examination and had not tested this type filter with asbestos dust.
 
 
 37
 Other testimony presented centered on the warnings given by American Optical and National Gypsum concerning the wearing and fitting of the respirator apparatus and the periodical changing of filters. Evidence showed that each respirator apparatus came in a box with an enclosed sheet of instructions for use and maintenance. National Gypsum also produced evidence of a respirator safety program used by their plant.[9]
 
 
 38
 At the close of the plaintiff's case American Optical moved for a directed verdict based on the lack of any evidence showing its product was unreasonably dangerous and not fit for normal use. The Court denied this motion. At the close of all the evidence American Optical renewed its motion which was again denied. The liability issue was submitted to the jury with a special verdict form to indicate whether the defendant American Optical was liable for either a defective design that was unreasonably dangerous or negligence in failing to warn of inherent danger in the respirator product.[10]
 
 
 39
 The jury found that the respirator apparatus was defective in design so as to be unreasonably dangerous and not fit for normal use and that it was a proximate cause of Porter's injury. The jury found American Optical not to have been negligent in failing to warn of dangers inherent in the use of the respirator apparatus. It further found that Porter did not voluntarily assume the risk which caused his illness. The plaintiff was awarded $155,000 in monetary damages.[11] Following this verdict the Court denied American Optical's motion for a judgment notwithstanding the verdict or, alternatively, for a new trial.
 
 
 40
 In a diversity case in this Circuit, federal courts apply a federal rather than a state standard for determining whether evidence in a trial is sufficient to create a jury question and to defeat a motion for a directed verdict or judgment n. o. v. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc). The standard is:
 
 
 41
 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence not just that evidence which supports the non-mover's case but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question to the jury.... There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses (footnote omitted).
 
 
 42
 Id. at 374-75. See McCormack v. Noble Drilling Corp., 608 F.2d 169 (5th Cir. 1979); Stockstill v. Gypsum Transportation, 607 F.2d 1112 (5th Cir. 1979); King v. Ford Motor Co., 597 F.2d 436 (5th Cir. 1979).[12]
 
 
 43
 Following the test outlined in Boeing, the function of an appellate court is "to ascertain whether there is a rational basis in the record for the jury's verdict; we are forbidden to usurp the function of the jury by weighing the conflicting evidence and inferences and then reaching our own conclusion." Bauman v. Centex Corp., 611 F.2d 1115 (5th Cir. 1980), quoting Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1288 (5th Cir. 1974). We therefore turn to an examination of the evidence presented at trial to see whether reasonable men in the exercise of impartial judgment could reach different conclusions based upon the controlling products liability jurisprudence of Louisiana.[13]
 
 
 44
 Under Louisiana law, a manufacturer of a product which involves a risk of injury to the user is liable to any person, whether a purchaser or a third person who without fault on his part is injured by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. In such a case, the plaintiff has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use and that plaintiff's injuries were caused by reason of the defect. Weber v. Fidelity & Casualty Ins. Co. of New York, 259 La. 599, 250 So.2d 754 (La.1971).
 
 
 45
 In Leathem v. Moore, 265 So.2d 270 (La.App.1972), the Louisiana Court of Appeals commented on this general rule outlined in Weber by adding:
 
 
 46
 The foregoing rule requires the manufacturer to exercise reasonable care in the design of its products which are of such nature that, if not carefully made, can cause foreseeable injury to persons using the products for purposes which the manufacturer may reasonably expect they will be employed, and also to those whom the manufacturer may reasonably expect to be endangered by such probable use. Failure to exercise such care renders the manufacturer liable if injury results from lawful use of the product in a manner and for a purpose which the manufacturer may be deemed to reasonably expect. However, such liability does not extend to the whole world, nor does it involve all risks that might result in injury.
 
 
 47
 Id. 265 So.2d at 276. See Fox v. American Steel Building Co., Inc., 299 So.2d 364 (La.App.1974).
 
 
 48
 A product is defective and unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect. Hagans v. Oliver Machinery Co., 576 F.2d 97 (5th Cir. 1978); Welch v. Outboard Marine Corp., 481 F.2d 252 (5th Cir. 1973) (applying Louisiana law); Daniels v. Albach Co., Inc., 365 So.2d 898 (La.App.1978). If a product is proven defective by reason of its hazard to normal use, a plaintiff need not prove any particular negligence by the maker in its manufacture or processing. The manufacturer is presumed to know of the defects in the thing he makes, whether or not he has actual knowledge of them. Weber, supra; Reeves v. Great Atlantic & Pacific Tea Co., 370 So.2d 202 (La.App.1979). See Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978) (plaintiff need not prove defective design or manufacture if he proves he was injured by a product "unreasonably dangerous to normal use").
 
 
 49
 In the present case, as hereinabove recited, there is a clear conflict in the evidence as to whether the American Optical respirator apparatus was defective in design and unreasonably dangerous for normal use.
 
 
 50
 We have considered American Optical's attacks on the testimony of Dr. George regarding the test procedure he employed to show a 9-20% passage of asbestos particles through the R-17 filter. American Optical points out that Dr. George was qualified as an expert toxicologist and not as an expert in the design and manufacturing of respirators or filters. Furthermore, the test was on only the R-17 filter and not on other various filters used by the National Gypsum plant. This filter was not in "new" condition but was a library sample quite a few years old. American Optical further contends that his testing procedure was conducted without consulting accepted industry standards for proper test procedures for respirators and filters and prior test data and reports from industry manufacturers and regulatory agencies. American Optical strongly urges that Dr. George's testimony was entitled to no weight whatsoever and should have been excluded. However, that Dr. George was qualified as an expert toxicologist and not as a design expert was made absolutely clear to the jury. Therefore, American Optical's objections went to the weight of his testimony rather than to its admissibility. Stempel v. Chrysler Corp., 495 F.2d 1247 (5th Cir. 1974) (per curiam). See Eastern Air Lines, Inc. v. American Cynamid Co., 321 F.2d 683 (5th Cir. 1963). Furthermore, Dr. George's test results were challenged by American Optical's witnesses. The weight, the accuracy, and the validity or invalidity of Dr. George's tests were submitted to the jury and that is all that was necessary.
 
 
 51
 American Optical argues that the jury's verdict was based on the absence of any evidence that the design of the respirator and filter did not measure up to the "state of the art" of the manufacturing process and the accepted standards in the industry. In particular, American Optical relies on the reasoning employed in Ward v. Hobart Manufacturing Co., 450 F.2d 1176 (5th Cir. 1971), Weakley v. Fischbach & Moore, Inc., 515 F.2d 1260 (5th Cir. 1975), and Dean v. General Motors Corp., 301 F.Supp. 187 (E.D.La.1969).
 
 
 52
 Ward was a diversity case from Mississippi involving the negligent design of a meat grinder. In that case this Court stated that it was necessary to measure the reasonableness of a product's design against objective standards.[14] The Court then held that the design of the meat grinder exceeded the standards of the meat grinder industry in 1948 and that it was reasonably safe. However, the Court added
 
 
 53
 Without placing the question of Hobart's negligence in its proper setting the district court concluded that the standards of an industry are not controlling, and hence that the entire meat grinder industry was lacking in ordinary care in 1948. Where there is strong evidence to counter the customary practices of an industry at time of manufacture we would agree, but in the present case no evidence and little case law was presented which would indicate that the standards to which Hobart adhered in 1948 were unreasonable.
 
 
 54
 450 F.2d at 1185.
 
 
 55
 We conclude that in total context Ward, besides being a Mississippi case instead of a Louisiana case, does not support the result sought by American Optical.
 
 
 56
 Weakley was a diversity suit from Texas involving as one issue the negligent design of an electrical isolator switch which exploded and seriously burned four electricians. The defendant in that action impleaded the parent company that designed the equipment and attempted to show that design alternatives could have been adopted which would have minimized or prevented accidents with the electrical equipment. In holding that the manufacturer and designer of the electrical equipment should have been granted a directed verdict, the Court stated:
 
 
 57
 It is one thing to show that the defendant might have designed a safer product; quite another to show that the product he did design was unreasonably dangerous. The defendant is not obliged to design the safest possible product, or one as safe as others make or a safer product than the one he has designed, so long as the design he has adopted is reasonably safe. (Citations omitted.)
 
 
 58
 515 F.2d at 1267. The Court did note that the defendant presented no evidence that the design of the equipment deviated from accepted industrial practice and, more importantly, said that no expert testimony had been presented to support the allegation that the design was unreasonably dangerous.
 
 
 59
 In Dean a District Court in Louisiana held that a Chevrolet ignition lock system was not defective in design. The Court noted that there was no defect in design if reasonable care had been taken in adopting it, even though the design was not perfect. Reasonable care depended upon facts known at the time the design was adopted. The Court added, however, that compliance with customs was not of itself sufficient to constitute due care. See Muncie Aviation Corporation v. Party Doll Fleet, Inc., 519 F.2d 1178 (5th Cir. 1975) (compliance or noncompliance with industry, group or organization custom is one factor the trier of fact may consider in applying a standard of care but it is not conclusive.)
 
 
 60
 American Optical contends that it designed and manufactured the respirator apparatus with reasonable care and that this is supported by industrial standards at the time of the design. It points out that the filter passed all tests for various dusts conducted by the Bureau of Mines and met all standards outlined by industry publications. Since it was in compliance with the "state of the art" and governmental standards, therefore, American Optical asserts that it could not have been negligent in designing a respirator and filter unreasonably dangerous to normal use.
 
 
 61
 In Simien v. S. S. Kresge Co., 566 F.2d 551 (5th Cir. 1978), this Court commented that testimony that a product far exceeded federal requirements was substantial evidence that the product was not unreasonably dangerous. This is bound to be true as an evidentiary proposition, but the Court also recognized that other courts had held compliance with the standard as not conclusive as a measure of defectiveness or unreasonable danger. See Raymond v. Riegel Textile Corporation, 484 F.2d 1025 (1st Cir. 1973); La Gorga v. Kroger Company, 275 F.Supp. 373 (W.D.Pa.1967). But in Simien the Court added:
 
 
 62
 If the plaintiff produces substantial expert or lay evidence that a (product) which complies with the federal standard is nevertheless unreasonably dangerous for normal use, the plaintiff is entitled to a jury determination. (Emphasis added.) 566 F.2d at 558.
 
 
 63
 The Court recently re-examined this standard in Quinn v. Southwest Wood Products, Inc., 597 F.2d 1018 (5th Cir. 1979). In Quinn a jury found a wooden ladder complying with or exceeding in design all relevant OSHA and industry standards to be nevertheless unreasonably dangerous and defective in design. Following Simien, the Court reversed and held that there was no substantial evidence to find the ladder unreasonably dangerous. In doing so, the Court noted that the evidence supporting the reasonable design of the ladder was overwhelming, undisputed, undenied, and unimpeached. It included industry and government design standards met by generous margins of safety and physical evidence. The evidence supporting faulty design was termed "sketchy and meager". No tests were introduced to dispute the evidence supporting reasonable design. 597 F.2d at 1024.
 
 
 64
 Louisiana courts have stated that the custom of the industry may be considered when determining the duty owed by a product manufacturer. This custom, however, is not conclusive. Leonard v. Albany Machine and Supply Co., 339 So.2d 458 (La.App.1976). In Leathem v. Moore, 265 So.2d 270 (La.App.1972), the Louisiana Court of Appeals commented:
 
 
 65
 By its very nature, the criteria of reasonable care, applicable in instances of this nature, must be flexible inasmuch as it depends on the peculiar facts and circumstances of each individual case. Even though a design may not be perfect or foolproof, it is still not defective provided reasonable care is taken in its adoption. On the other hand, neither custom nor usage in manufacturing style, nor prolonged marketing and use without significant injury producing accidents, can exonerate the manufacturer from liability for reasonably foreseeable injury resulting from use. These latter factors are merely part of the attending circumstances which must be weighed and considered in each case of this nature.
 
 
 66
 Id. at 276.
 
 
 67
 In this case it is undisputed that Porter had asbestos fibers in his lungs, that asbestosis was a cause of death, and he could not have inhaled the asbestos fibers anywhere but in National Gypsum's plant. He had worked there for twenty one years before the asbestosis symptoms first appeared. That being so, the issue of liability on the part of the filter supplier turns on two points: whether there was evidence that Porter used the filters in question, and whether they were defective for their intended use. There was evidence that Porter did use the filters during the period in question and we have detailed the evidence as to the filter defect.
 
 
 68
 Unlike the situations present in Quinn, supra, and Weakley, supra, the Porter jury had the testimony of two experts, and the specific findings from tests, to support the view that the R-17 filter was defective in letting through a dangerous number of asbestos particles. Disastrously for American Optical, we think, the evidence revealed that even though American Optical followed and relied upon testing standards formulated by the Bureau of Mines, those test procedures did not involve asbestos particles but only lead and silica particles. Testimony from one of plaintiff's witnesses asserted that the government and industrial testing standards were themselves inadequate and it cannot be disputed that there was information available to indicate the need for better test procedures for asbestos filters.[15] Keeping in mind the Ward and Dean decisions relied upon by American Optical, a jury could have concluded that the customary practices and standards of the entire respirator and filter industry were defective for failure to test with asbestos particles.[16] Considering the risks involved in using the American Optical respirator apparatus and based upon the conflicting testimony, a reasonable jury could have concluded, as this jury did, that the product was "unreasonably dangerous" as characterized under Louisiana law. See Welch v. Outboard Marine Corp., 481 F.2d 252 (5th Cir. 1973) (applying Louisiana law); Daniels v. Albach Co., Inc., 365 So.2d 898 (La.App.1978).[17]
 
 
 69
 We believe that there was substantial evidence from which a jury could conclude that a defective design in the respirator apparatus proximately caused Porter's injury. The plaintiff's burden is to prove causation by a preponderance of the evidence, which may be met by direct or circumstantial evidence. The evidence need not negate all other possible causes. Weber, supra, 259 La. 599, 250 So.2d at 757. See Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (La.1971); Reeves v. Great Atlantic & Pacific Tea Co., 370 So.2d 202 (La.App.1979).
 
 
 70
 Even though there was testimony that Porter did not wear his respirator during 50% of the time of a work day, this evidence related mainly to Porter's work at the cement pump house which involved exposure to high levels of cement and silica dust, not asbestos dust. Other evidence indicated that Porter did wear his respirator inside the main plant where asbestos dust was more prevalent. The experiment conducted by Dr. George revealed that a dangerous level of asbestos particles did penetrate an R-17 filter. The expert mechanical engineer, Benjamin Lehman, testified that Dr. George's experiment was valid. The ultimate fact is that Porter did contract a strong case of asbestosis and it killed him after long periods of painful disability. It is not denied that this condition directly led to Porter's illness and death. Appraising the evidence as a whole, a jury could reasonably have concluded that defective design of the respirator, which failed to inhibit inhalation of the asbestos particles, was a proximate cause of Porter's injury and death.
 
 
 71
 The federal standard enunciated in Boeing, supra, was met. Under Louisiana products liability law the evidence was such that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions on whether the American Optical respirator apparatus was defective in design and thereby a proximate cause of Porter's illness and death. Consequently, we have no warrant for appellate interference with the verdict and hold that the motions for a directed verdict of judgment n. o. v. were correctly denied by the District Court. The judgment against American Optical on the issue of liability is affirmed.
 
 III. Insurance Coverage, or No Coverage
 
 72
 The second issue, the one raised by the respective insurance carriers, is whether the trial court properly held Hartford solely liable for insurance coverage against the loss sustained by American Optical. The real question is whether insurance liability for injury from a cumulative, progressive disease, such as asbestosis, should be apportioned among various insurers on a pro rata basis according to an "injurious exposure" approach or, instead, should be applied to only one of the insurers under a "first manifestation" theory. We have concluded that as to the case presently before us and now being decided "injurious exposure" is the correct test.
 
 
 73
 From 1954 to January 1, 1971, Aetna provided coverage. Aetna produced the insurance policies covering the period 1967 to 1971. While neither Aetna nor the insured were able to locate any earlier policies, Aetna conceded that it insured American Optical from 1954 to January 1, 1971. Aetna's coverage period spanned the first years of Porter's exposure to asbestos particles but ended prior to his hospitalization and an outward manifestation of asbestosis.
 
 
 74
 From January 1, 1971 to January 1, 1975, Hartford provided coverage in two separate policies. The first Hartford policy (Hartford # 1) was in effect from January 1, 1971 to January 1, 1974. The second Hartford policy (Hartford # 2) was in effect from January 1, 1974 to January 1, 1975. The named insured on both of these policies was the Warner-Lambert Company. Hartford agreed, however, that American Optical, as a corporate affiliate of the named insured, was insured for the enumerated years. Hartford's policy period covered several years of Porter's exposure to asbestos particles and the years during Porter's hospitalization, outward manifestation of asbestosis symptoms, and onset of permanent disability.
 
 
 75
 From January 1, 1975 to January 1, 1978, Continental provided coverage. During this policy period Porter remained permanently disabled, asbestosis was formally diagnosed as his disease, and Porter died. It must be emphasized, however, that no exposure to asbestos dust, or use of the American Optical respirator apparatus, occurred during the period of Continental's coverage.
 
 
 76
 All the policies insuring American Optical are of a type generally referred to as "occurrence" policies. Each of the policies provides that the company will pay on behalf of the insured all sums which the insured becomes obligated to pay as damages because of bodily injury caused by an occurrence.
 
 
 77
 The Aetna policy defines "occurrence" and "bodily injury" as follows:
 
 
 78
 "Occurrence" means an event which unexpectedly caused injury during the policy period or a continuous or repeated exposure to conditions which unexpectedly caused injury to person or tangible property during the policy period. All such exposure to substantially the same general conditions shall be deemed one occurrence. (Emphasis added).
 
 
 79
 "Bodily injury" means bodily injury, sickness or disease sustained by any person; ....
 
 
 80
 The Hartford # 1 policy provides the following definitions for these terms:
 
 
 81
 "Occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured; (emphasis added) ...
 
 
 82
 "Bodily injury" means bodily injury, sickness or disease sustained by any person; ....
 
 
 83
 The Hartford # 2 policy provides these slightly altered definitions:
 
 
 84
 "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;
 
 
 85
 "Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom; (emphasis added).
 
 
 86
 The Continental policy defines these terms as follows:
 
 
 87
 "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;
 
 
 88
 "Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom; (emphasis added).
 
 
 89
 Following the jury verdict of liability and damages owed by American Optical, the parties, as reserved by stipulation, submitted the issue of insurance coverage to the District Court. After an examination of the terms of each of the pertinent policies, the Court held that the Hartford # 1 and # 2 policies provided the coverage applicable to the loss sustained by American Optical.[18] The Court reasoned the Aetna policy did not provide coverage because exposure to the asbestos during its coverage did not result in a manifestation of injury, sickness or disease and, therefore, there was no occurrence of bodily injury. Continental was absolved of liability because both exposure and manifestation of the illness occurred prior to its coverage.
 
 
 90
 The insurance was written for the protection of the filter manufacturers not for the asbestos manufacturer. The respirators, however, were intended to defeat the health hazards involved in employment in the asbestos plant. Consequently, we see no reason for treating this case any differently than that of an asbestos manufacturer, i. e., the controlling principles should be the same.
 
 
 91
 During most of the period in question, American Optical had three insurers. Aetna had the coverage during most of the period when the asbestos particles accumulated in Porter's lungs but before the disease manifested itself. Hartford had the coverage when the illness became manifest. Continental came in after Porter had taken disability retirement but before his death. Nothing done or omitted by American Optical after Porter quit work could have contributed to or been a proximate cause of his illness or death.
 
 
 92
 There was medical evidence that each introduction of fibers into Porter's lungs was "bodily injury", cumulatively and progressively more harmful to the victim.
 
 
 93
 Hartford argues for the application of a proration theory of insurance coverage that will spread liability and cost proportionately among all insurers that insured American Optical during the time Porter was exposed to asbestos particles and injured. It is supported in its cause by several amici curiae.[19] The dismissed defendant insurance companies, Aetna and Continental, support a manifestation theory of coverage which would place entire liability and cost on the insurer covering American Optical at the time the asbestos-related disease first surfaced and made itself known through demonstrable symptoms. They also are supported by numerous amici curiae.[20]
 
 
 94
 The District Court commented that Louisiana law controlled the diversity action and cited Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Louisiana law did control the issues of negligence and products liability, but it does not automatically follow that Louisiana law controls interpretation of the insurance contracts here in question. In a diversity case a federal court is to follow the choice-of-law rules of the jurisdiction in which it sits. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Louisiana follows the general rule that the nature, validity and construction of a contract is to be determined by the law of the place where it was made. United States Leasing Corporation v. Keiler, 290 So.2d 427 (La.App.1974); Bologna Bros. v. Morrissey, 154 So.2d 455 (La.App.1963). Absent contrary intent by the parties, a contract is considered executed at the place where the offer is accepted or where the last act necessary to a meeting of the minds or to completing the contract is performed. Williams v. Travelers Ins. Co. of Hartford, Conn., 19 So.2d 586 (La.App.1944). Insurance policies are to be construed and interpreted the same as other contracts and written agreements. Martin v. Phillips, 356 So.2d 1016 (La.App.1977); Savoie v. Fireman's Fund Ins. Co., 339 So.2d 914 (La.App.1976), aff'd, 347 So.2d 188 (La.1977); Dean v. Union Nat. Fire Ins. Co., 301 So.2d 925 (La.App.1974). We assume, in the absence of a showing to the contrary, that these insurance contracts were made in Louisiana or in a state where the law would be the same as that of Louisiana.
 
 
 95
 The policy language used by all three insurers in their policies is similar in context and provides the same extent of coverage. Each policy provides that the insurer will pay to the insured all sums which the insured is obligated to pay as damages because of bodily injury caused by an occurrence. "Bodily injury" is defined in each policy to include "bodily injury, sickness or disease." "Occurrence" is defined in each policy to mean an accident or event or a continuous or repeated exposure to conditions which causes or results in bodily injury. The only distinguishable variation found among the policies' use of these terms is the placement of the phrase "during the policy period." In the Aetna and Hartford # 1 policies this phrase is placed in the definition of "occurrence." In the Hartford # 2 and Continental policies this phrase is placed in the definition of "bodily injury."
 
 
 96
 In analyzing the provisions of the policies involved, the District Court stated:
 
 
 97
 In the instant case each of the three defendant insurers has a policy limiting coverage to "occurrences" taking place during the policy period.
 
 
 98
 The Court further equated "bodily injury" with "sickness or disease". Based upon this rationale, the Court held that Aetna was not liable because Porter did not sustain bodily injury as the result of an occurrence during Aetna's policy period since the sickness or disease did not manifest itself during Aetna's policy. The Court also held that Continental was not liable because the "occurrence", i. e., exposure to asbestos dust, occurred prior to its policy coverage. Hartford was held liable because exposure occurred and bodily injury manifested itself during its policy period.
 
 
 99
 Since the District Court decided this case the Sixth Circuit has decided Insurance Company of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (1980). That Court rejected the "manifestation" theory of insurance coverage in asbestosis cases and accepted the "injurious exposure" theory. It held that the insurance coverage (liability) should be prorated among all the carriers as to liability for cumulative, progressive lung disease as a result of exposure to asbestos products, except that an insurer would not be liable for any period where there was no exposure to asbestos manufactured by the insured.
 
 
 100
 We might prolong this already lengthy opinion by paraphrasing or rephrasing the Sixth Circuit opinion. We are content to say that we agree with its reasoning and result. Under the terms of the policies presently before us we reject the "manifestation" theory. We accept the "injurious exposure" theory and the logically consequent rule of proration of liability for insurance carriers who were on the coverage while the injured party was exposed to the asbestos hazards which resulted in illness and death.
 
 
 101
 We, therefore, hold that the judgment of the District Court assessing coverage solely to Hartford must be reversed and the cause remanded for proration of coverage (liability) between Aetna and Hartford in keeping with the teachings of the Sixth Circuit opinion. We realize that proration of the exact amount of liability to be assessed to Aetna and Hartford may be complicated by other aspects of the insurance policies which are not presently in issue. We simply observe that elapsed time of insurance company coverage for the total time involved (1954-1974) should be the basic fundamental of the required apportionment.CONCLUSION
 
 
 102
 The judgment of the District Court against American Optical is affirmed.
 
 
 103
 The judgment of the District Court absolving Continental of liability on its insurance is affirmed.
 
 
 104
 The case is remanded for an apportionment of liability as between Aetna and Hartford.
 
 
 105
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 Trial testimony does not reveal whether or not American Optical furnished respirators from the time Porter was first employed in 1950. American Optical did furnish them starting in 1953 and during the time it was insured by Aetna, Hartford, and Continental. The testimony of National Gypsum Supervisor Lincks reveals this:
 Q. Now, in the course of working at National Gypsum, Mr. Lincks, was Mr. Porter required to wear a respirator?
 A. In certain areas, yes.
 Q. And, is this true throughout his working there from 1953, let's say, until the present?
 A. Yes, sir.
 Q. Do you recall, Mr. Lincks, what type or what kind of respirator you were using at National Gypsum from 1953 to the present?
 A. I'm not too familiar with the numbers, but I remember R-2000 series and later probably going to a R-5000 series.
 Q. Do you know who the manufacturer of that respirator was?
 A. American Optical.
 Q. Do you know of any other type of respirator other than one manufactured by American Optical Company that was in use at National Gypsum for this period of time?
 A. No, sir.
 Q. That's the only manufacturer?
 A. Yes.
 1A During cross-examination, Dr. Bruce Held, an expert witness offered by defendants, admitted that there were different types of asbestos particles. He specifically named two types, crocidolite and amianthus, but could not recall all the types. The attorney for the plaintiff discussed three additional types cross fibers, slip fibers, and mass fibers listed in a publication called "Asbestos" put out by the Bureau of Mines of the United States Department of Interior.
 
 
 [2]
 The size, shape, strength, texture, and flexibility of various asbestos fibers may affect the ability of the fibers to pass through a filter. Fibers which have a smooth surface and high flexibility are more likely to pass through a filter. Those with a rough surface and hard texture are more likely to be trapped by a filter screen
 
 
 [3]
 Testimony revealed that asbestos particles are present in all breathing environments. Almost all persons in an urban setting, therefore, are likely to breathe in a small number of asbestos particles. No danger is present, however, unless a substantial number of particles are inhaled from an area concentrated with the fibers
 
 
 [4]
 Testimony from various employees at National Gypsum asserted that Porter often did not wear his respirator. Supervisor Nolte Lincks stated that Porter wore the respirator less than one half the time in his working area at the cement pump house where it was required. He added, however, that Porter was not required to wear the mask at his station during all eight hours of his working day. Edward Benezech, assistant personnel and safety supervisor for several years at the plant, testified that he saw Porter not wearing his mask at various times when it should have been worn. Willie Field, a relief man at the plant, saw Porter not wearing his mask; however, this was only when Porter was going to and from work and at lunch, times when the mask was not required to be worn
 
 
 [5]
 Porter's wife testified at trial, however, that Porter first began experiencing breathing problems and coughing spells in 1969. During this time Porter took cold medicine and cough syrup to relieve his condition
 
 
 [6]
 The defendant introduced at trial evidence of other factors that could have contributed to Porter's death. Two of these factors were Porter's moderate to heavy smoking and drinking. Dr. Morton Brown testified for the plaintiff that smoking was a contributing factor to Porter's lung condition. He further stated that no evidence of lung cancer or any tubercularin germ was ever found in Porter. He indicated that any emphysema in Porter was related to asbestosis. Dr. Brown concluded, "The asbestos initiated a chain of events that culminated in his death."
 
 
 [7]
 The plaintiff introduced two respirator apparatus into evidence during the trial as plaintiff's exhibits six and seven. The exhibit six mask contained an R-17 filter. The exhibit seven mask contained a different R-25 filter. The R-17 apparatus was the exhibit continually used by the plaintiff at trial and identified by employees at National Gypsum as the type used by them
 
 
 [8]
 Dr. Held noted that National Gypsum's respirator program did not include proper atmosphere testing to determine the type of respirator needed, proper cleaning and maintenance, proper storage in a clean atmosphere, and daily inspection and maintenance for defects and fitting
 
 
 [9]
 The evidence relating to warnings and various safety programs was introduced at trial to establish whether American Optical was negligent in failing to warn of dangers inherent in the use of its respirator product. Since this issue was resolved by the jury in favor of American Optical, it is not at issue on appeal and these programs need not be discussed in detail
 
 
 [10]
 The special verdict given to the jury propounded six questions:
 
 
 [1]
 Was the respirator apparatus manufactured by Defendant, American Optical Corporation, defective in its design so as to be unreasonably dangerous and not fit for normal use?
 Yes ________ No ________
 
 
 [2]
 Was such a defect a proximate cause of injury to Mr. Porter?
 Yes ________ No ________
 
 
 [3]
 Was defendant, American Optical Corporation, negligent in failing to warn Mr. Porter of dangers inherent in the use of the respirator apparatus?
 Yes ________ No ________
 
 
 [4]
 Was such negligence a proximate cause of injury to Mr. Porter?
 Yes ________ No ________
 
 
 [5]
 Did Mr. Porter voluntarily assume the risk which caused his illness?
 Yes ________ No ________
 
 
 [6]
 What amount of money, expressed in dollars, will fairly and adequately compensate Plaintiffs for their injuries? $
 
 
 [11]
 During trial the plaintiff offered an economist who established that lost earnings and support occurring prior to Porter's death totaled $26,600. Loss of future earning capacity based upon life expectancy totaled $28,000, for a sum total of $54,600 for loss of wages and support. This amount did not take into consideration possible damages to be awarded for funeral expenses, family loss of "society", physical pain and suffering and mental anguish by Porter prior to death, incurred medical expenses, loss of household services performed by Porter, and mental anguish suffered by the surviving family due to Porter's death
 
 
 [12]
 In Campbell v. Mouton, 373 So.2d 237 (La.App.1979), the Louisiana Court of Appeals adopted the Boeing standard for state practice
 
 
 [13]
 While a federal standard is employed for determining sufficiency of the evidence, state law controls the substantive issue of whether the evidence proved a defective design in a product liability action. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)
 
 
 [14]
 The objective criteria listed by the Court were: (1) conformity of defendant's design to the practice of other manufacturers in its industry at the time of manufacture, (2) the open and obvious nature of the alleged danger, and (3) the extent of a claimant's use of the very product alleged to have caused the injury and the period of time involved in such use by the claimant and others prior to the injury without any harmful incident. 450 F.2d at 1182. The Court also noted that none of these factors alone was controlling
 
 
 [15]
 On cross-examination, Benjamin Lehman testified:
 Q. Now, is it not a fact that the Bureau of Mines for many years made no distinction between a respirator device and the filters that were categorized as dust respirators and the ability of those devices to hold out, block asbestos, silica or similar dust particles?
 A. So far as I know that is a true statement. But as you know, these regulatory agencies are very slow to move. There was a great deal of information known in the industry which indicated they should have done something.
 Lehman also testified that a safer respirator could have been designed.
 Q. You can answer that question.
 A. It is certainly possible to design one that would be more than ninety-nine and three quarters percent effective. In other words, less than one-quarter of one percent would get through. Approximately one-eighth of one percent or even less than that. Absolute effectiveness, of course, is like all like the status of purity, nothing is one hundred percent zero zero zero pure.
 Of course, the fact that a safer product could have been designed is not conclusive that the design was unreasonably dangerous. Weakley v. Fischbach & Moore, Inc., 515 F.2d 1260 (5th Cir. 1975).
 
 
 [16]
 In 1972, the National Institute for Occupational Safety and Health (NIOSH) replaced the Bureau of Mines as the federal agency issuing government approval for respirator and filter products. The 1972 NIOSH guidelines were more strict and made the American Optical products obsolete under the new standards. Manufacturers were given a grace period to convert production to newer standards prior to a total ban on the older products. While reasonableness of conduct must be judged in light of circumstances at the time of manufacture, Ward v. Hobart Manufacturing Co., 450 F.2d 1176, 1182 n.16 (5th Cir. 1971) and cited cases, American Optical was on notice of possible defects in the respirator product from 1972 until the time Porter discontinued his employment due to the new NIOSH regulations
 
 
 [17]
 American Optical has asserted in its brief that the issues in the present case are parallel to those in the Ward decision and that a close examination of the Ward reasoning will prove that the jury's verdict was clearly erroneous for failing to measure the reasonableness of a product's design against objective standards. We do not feel strictly bound by the reasoning set out in Ward since in that case the Court was applying Mississippi law and found little state law in the area of negligent design of products. The differing facts and evidence also necessitate distinguishment. We are obligated to view a jury's perception of reasonable design under Louisiana law. Most of the pertinent Louisiana cases speaking to products liability law have been decided since the Ward decision
 When examining the objective standards followed in Ward, we observe that the Court did not consider any one factor controlling. As already noted, Louisiana considers industry custom as one factor to be considered in determining reasonable design of products. However, this is not by itself conclusive.
 Concerning its second objective factor, Ward stated that the open and obvious nature of an alleged danger generally favored no negligence in design. 450 F.2d at 1182, n.17. In the present case the danger in the design of the filter is anything but open and obvious to the consumer user, thereby making it latently dangerous and weighing against reasonable design under the Ward analysis.
 The third objective factor discussed in Ward recognized that the long period of time a product had been on the market without accident favored a reasonable design. The Louisiana Court of Appeals has addressed this issue in Leathem v. Moore, 265 So.2d 270 (La.App.1972), noting this factor cannot exonerate a manufacturer from liability if injury is still reasonably foreseeable.
 
 
 [18]
 In a post trial memorandum, Hartford argued that the Hartford # 1 policy did not provide coverage because of an exclusion clause. Exclusion K in the policy provided in part that the insurance would not apply to bodily injury resulting from the failure of the insured's products to perform the function or serve the purpose intended by the insured if the failure was due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by the insured. This exclusion did not apply to bodily injury resulting from the active malfunctioning of such products
 The District Court found it unnecessary to determine whether Exclusion K could defeat coverage by Hartford # 1 since it found coverage was clearly provided by Hartford # 2 due to Porter's exposure to asbestos dust and illness during this policy period. The Court noted that factual questions surrounding applicability of the exclusion were not tried.
 
 
 [19]
 The amici curiae supporting either a proration theory or an exposure theory include the Keene Corporation and certain underwriters at Lloyds, London and Turegum Insurance Company, Andrew Weir Insurance Company and River Thames Insurance Company
 
 
 [20]
 The amici curia supporting a manifestation theory include the Insurance Company of North America, Federal Insurance Company, Fireman's Fund Insurance Company, Liberty Mutual Insurance Company, Eagle-Picker Industries, Inc., and certain underwriters at Lloyds, London and Walbrook Insurance Company along with other included British companies