CONTINENTAL CASUALTY
COMPANY, Plaintiff,

v.

SYNALLOY CORPORATION, General
Accident Fire and Life Assurance Cor-
poration, Ltd., Midland Insurance
Company, Fireman's Fund Insurance
Company, Stonewall Insurance Compa-
ny, Certain Underwriters at Lloyd's and
all Other Underwriters Subscribing to a
Policy of Insurance No. Lom 9081, Cer-
tain Underwriters at Lloyd's and all
Other Underwriters Subscribing to a
Policy of Insurance No. Lom 9080, Cer-
tain Underwriters at Lloyd's and all
Other Underwriters Subscribing to a
Policy of Insurance No. Lom 9520,
First State Insurance Company, Lex-
ington Insurance Company, American
Mutual Liability Insurance Company,
Appalachian Insurance Company, Affil-
iated F.M. Insurance Company, Fred
Brown, Jr., Willie Hall, Alex Oliphant,
Otis Powell, Joe Roberts, James Stur-
gis, Roger Utley, and Robert White, De-
fendants.

SYNALLOY CORPORATION,
Third-Party Plaintiff,

v.

COLUMBIA CASUALTY COMPANY
and Continental Insurance
Company, Third-Party Defendants.

No. CV182–158.

United States District Court,
S.D. Georgia,
Augusta Division.

Sept. 28, 1983.

See also, 667 F.Supp. 1550.

David A. Handley, Thomas E. McCarter, Michael W. Higgins, Atlanta, Ga., for Continental Cas. Co.

Blake & Thompson, Joseph J. Blake, Jr., Haynsworth, Marion, McKay & Guerard, Thomas H. Coker, Jr., Greenville, S.C., James M. Thompson, Lee & Clark, P.C., Savannah, Ga., for Synalloy Corp.

R. Coleman Miller, James B. Hiers, Atlanta, Ga., for General Acc. Fire and Life Assur. Corp., Ltd.

Laronce Beard, Augusta, Ga., for Joe Roberts.

Daniel S. Reinhardt, John P. Dalton, Atlanta, Ga., for Charles Allen Skey, Rep Underwriter at Lloyd's, Walbrook Ins. Co., Ltd., St. Katherine Ins. Co., Ltd. (XA/C), St. Katherine Ins. Co., Ltd, Turegum Ins. Co., Bellefonte Ins. Co., English & American Ins. Co., Dominion Ins. Co., Ltd. and Lexington Ins. Co.

David B. Higdon, Joseph H. Davis, Macon, Ga., for Fidelity & Cas. Ins. of New York.

Taylor Putney, Jr., John D. Jones, Atlanta, Ga., for American Mut. Liability Ins. Co.

Luhr G.C. Beckmann, Jr., Andrew J. Hill, III, Beckmann & Pinson, P.C., Savannah, Ga., for General Acc. Ins. Co.

Ronald D. Reemsnyder, Atlanta, Ga., for First State Ins. Co.

James McGuire, Mendes & Mount, New York City, Wm. Byrd Warlick, Augusta, Ga., for Columbia Cas. Co.

Percy J. Blount, Burnside & Wall, Augusta, Ga., for Brown, Hall, Oliphant, Powell, Sturgis, Utley and White.

J. Robert Persons, Lord, Bissell & Brook, Atlanta, Ga., for Appalachain Ins. Co. and Affiliated FM Ins. Co.

John W. Winborne III, Atlanta, Ga., for Midland Ins. Co. and First State Ins. Co.

Richard R. Mehrhof, Jr., Augusta, Ga., for Stonewall Ins. Co.

#### Table of Contents

| | Page |
|---|---|
| I. Introduction | 1526 |
| II. Factual Background and Procedural History | 1527 |
| III. Synalloy's Motion for Partial Summary Judgment Against General Accident and Continental | 1530 |
| A. Synalloy vs. General Accident | 1530 |
| B. Court's Discussion and Analysis | 1531 |
| C. Synalloy vs. Continental | 1537 |
| D. Court's Discussion and Analysis | 1538 |
| IV. Synalloy's Motion for Summary Judgment Against First State and F & C | 1542 |
| A. Synalloy vs. First State | 1542 |
| B. Court's Discussion and Analysis | 1543 |
| C. Synalloy vs. F & C | 1547 |
| V. Synalloy vs. Continental Reprise | 1548 |
| VI. Summary | 1549 |
| VII. Conclusion | 1549 |

## ORDER

EDENFIELD, District Judge.

### I. Introduction

The Court has before it defendant Synalloy Corporation's motions for partial summary judgment and for summary judgment on its cross-claims against General Accident Fire and Life Assurance Corporation, Ltd. and First State Insurance Company, on its counterclaim against Continental Casualty Company and on its third-party complaint against Fidelity & Casualty Insurance Company of New York. Oral argument on the motions was heard on April 14, 1983.

Synalloy Corporation [hereinafter "Synalloy"] is entitled to summary judgment only if it carries its demanding burden of demonstrating that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1030 (5th Cir. Unit B 1982). To assess whether Synalloy has met this burden, the Court has viewed all admissible evidence and factual inferences drawn therefrom in the light most favorable to the non-movants, *see Warrior Tombigbee Transp. Co. v. M/V NAN FUNG*, 695 F.2d 1294, 1296 (11th Cir.1983), and has resolved all reasonable doubts about the facts in favor of the parties opposing the motions. *Id.; Southway Theatres, Inc. v. Georgia*

*Theatre Co.,* 672 F.2d 485, 493 (5th Cir. 1982). Moreover, though many of the issues here are legal in nature, the parties do disagree about the inferences that should be drawn from certain facts. If these issues are genuine and the factual inferences reasonable and material, summary judgment is, of course, improper. *Warrior Tombigbee, supra,* at 1296; *Clemons v. Dougherty County, Georgia,* 684 F.2d 1365, 1369 (11th Cir.1982).

This declaratory judgment action arises out of other litigation in which Synalloy has been involved. To an extent, the eventual outcome of these other cases will solidify the positions of the parties in the suit at bar. The Court is aware of settlement negotiations which have ensued and in some cases have been finalized in these related actions and is troubled by the possibility that a ruling on these motions may be premature. Furthermore, substantial questions, not raised in these motions, are before the Court in the instant action and the record is not yet complete. None of the parties to these particular motions has voiced any such reservations, however, and it appears that any ruling issued by this Court may be beneficial to the advancement of this litigation.

## II. Factual Background and Procedural History

The following account of events contains some facts of only historical significance, facts which are not disputed by the parties, and facts as to which the Court concludes there is no genuine issue. Where a fact is the subject of dispute, it will be duly noted as will be mere allegations.

Synalloy, a South Carolina corporation, purchased the assets[1] of Augusta Chemical Company in 1967. During the period between 1946 and 1972, Augusta Chemical Company and then Synalloy used in the manufacturing process the chemical beta-naphthylamine (BNA) which once was widely used in dyes and rubber. Its carcinogenic properties have been publicized in recent years and use of BNA in production and research has been sharply curtailed. Workers exposed to BNA suffer a risk of developing cancer of the bladder and other disorders of the urinary tract. Since the dissemination to the public of information concerning the hazards of exposure to BNA, efforts have been made to contact Augusta Chemical and Synalloy workers and to conduct medical screening of these employees.

A number of lawsuits have been filed against Synalloy in the Superior Court of Richmond County, Georgia and in the United States District Court for the Southern District of Georgia, Augusta Division, by claimants alleging injuries as a result of exposure to BNA during their employment with Augusta Chemical Company or Synalloy. In these actions, the plaintiffs contend that BNA was a known carcinogenic agent; that Synalloy knew or should have known the effects of BNA on the human body; that plaintiffs themselves did not know or appreciate the dangers of BNA until January, 1981; that Synalloy failed to warn them of the effects, failed to provide a safe work place and failed to provide proper safety and protective equipment. They further allege that Synalloy deliberately concealed the danger of BNA from the plaintiffs and intentionally did nothing to protect the plaintiffs; and that this fraudulent concealment aggravated the condition of the plaintiffs. They also contend that these actions of Synalloy injured their peace, feelings and happiness. Pain and suffering damages, medical expenses, and punitive damages are sought. Alternatively, the plaintiffs seek damages for the injuries to their peace, feelings and happiness.

The institution of these lawsuits naturally raised the question of insurance coverage. Numerous carriers have provided various kinds and amounts of coverage for Augusta Chemical Company and Synalloy during the years from 1946 to the present. American Mutual Liability Insurance Company issued workers' compensation, em-

---

1. This is Synalloy's characterization of the transaction. The details of the acquisition have not been produced to the Court.

ployer's liability and general liability policies to Augusta Chemical Company prior to its acquisition by Synalloy in 1967. General Accident Fire and Life Assurance Company Corp., Ltd. [hereinafter "General Accident"] has issued to Synalloy workers' compensation, employer's liability and comprehensive general liability policies prior to and since 1967, including to the present. Augusta Chemical Company has been insured by General Accident under those policies since 1967. Continental Casualty Company [hereinafter "Continental"] issued two excess liability policies to Synalloy, one for the period from August 31, 1969 to August 31, 1972, and the second for the period from August 31, 1972 to August 31, 1975. First State Insurance Company [hereinafter "First State"] provided excess coverage from May 3, 1980 until April 8, 1982. Fidelity & Casualty Insurance Company of New York [hereinafter "F & C"] issued an excess policy to cover the period from April 8, 1982 to January 1, 1983. Other carriers, not party to these motions also issued policies covering various periods of time.

General Accident, as the primary insurance carrier, was notified by Synalloy that a civil action had been filed against Synalloy d/b/a Augusta Chemical Company in state court by BNA claimants. By letter of July 30, 1981, General Accident informed Synalloy that it would undertake defense of the suit under a reservation of rights, based on its position that a question of coverage existed. According to the insurer, Insuring Agreement IV [2] and Exclusion (e) [3] of its workers' compensation and employer's liability policy in effect from January 1, 1972 to January 1, 1973 precluded coverage of the claims raised in the lawsuit. Consequently, General Accident informed Synalloy that it intended to seek declaratory relief on this question of coverage. General Accident further denied any obligation to defend or indemnify any claims for injury or death of Augusta Chemical Company employees which occurred prior to September 29, 1967, when General Accident first named Augusta Chemical Company as an insured and also denied any coverage at all under the comprehensive general liability policies. In addition, General Accident noted that the limit of its coverage was $100,000 under its 1972–73 policy, in the event coverage was available. Synalloy Exhibit A.

Thereafter, Synalloy brought a declaratory judgment action, raising the General Accident policy coverage issues, in the United States District Court for the District of South Carolina while that action was pending, General Accident and Synalloy negotiated an agreement whereby General Accident agreed to afford coverage for BNA claims under Coverage B of the workers' compensation and employer's liability policies in effect from January 1, 1967 to January 1, 1973, waiving Exclusion (e) under those policies. No other terms, conditions, exclusions or limitations were changed. Synalloy, in turn, agreed to place its workers' compensation, general liability and auto liability with General Accident under a three-year retrospective plan for the period from January 1, 1972 to January 1, 1985. Losses and legal expenses paid in connection with the BNA claims were included in the "retro" plan. The terms of the agreement were summarized in the January 25, 1982 Letter Agreement, as follows:

> To sum up, it is the intent of Synalloy and General Accident that General Accident shall provide coverage for the BNA claims under both Coverages A and B and shall waive the Exclusion (e) for as long as Synalloy shall keep its WC–GL–AL insurance in force with General Accident on the basis of a Plan D Retro as outlined above, the rates being subject to

---

**2.** IV. *Application of Policy.* This policy applies only to injury (1) by accident occurring during the policy period, or (2) by disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of the insured, to conditions causing the disease occurs during the policy period.

**3.** *This policy does not apply:* (e) under coverage B, to bodily injury by disease unless prior to thirty-six months after the end of the policy period written claim is made or suit is brought against the insured for damages because of such injury or death resulting therefrom.

change on an annual basis in accordance with the applicable rates and rating plans. While such insurance is maintained, coverage will be afforded for the BNA claims by General Accident and *paid* losses and expenses included in the annual retro adjustments. If Synalloy should terminate its WC–GL–AL insurance before expiration, it shall be liable to pay General Accident at the next annual retro adjustment date the full amount of all incurred BNA losses and expenses on the basis of the existing reserves for such claims; and General Accident shall have no liability on any such claims filed after the date of the termination. If the WC–GL–AL insurance is not renewed with General Accident at its expiration on 1/1/85, Synalloy shall continue to pay for BNA claims then reported on the basis of annual retro adjustments on a paid basis; but General Accident shall afford no coverage for any such claims made after the expiration of the policy. If the WC–GL–AL insurance is renewed on mutually acceptable terms, General Accident shall continue to afford coverage for new claims made during the new coverage period or periods on the basis described. Synalloy Exhibit B.

After entering this agreement, Synalloy and General Accident settled the declaratory judgment action in South Carolina. The question of the limits of coverage, as the Court understands it, was reserved and General Accident maintains its position that its coverage for the years 1967–1972 is $100,000 per year, while Synalloy argues that the limit is $100,000 per claimant.[4] General Accident has notified Synalloy that once the policy limits have been exhausted, it will no longer continue to defend any suits which it is then defending.

As a result of the agreement, General Accident undertook to defend, under a reservation of rights, those tort actions which it deemed were possibly within its policy limits. The record does not reflect the number or identity of the suits defended by

General Accident. (In a post-hearing brief, Synalloy states that General Accident is defending 46 cases while Synalloy has assumed the defense of 68 cases). Because General Accident did not provide a defense in all of the BNA cases and because of its position on the question of the monetary limits of coverage, Synalloy turned to excess carriers for defense and indemnity. Continental received notice from Synalloy of the BNA claims in June, 1981. Continental declined to defend any of the lawsuits on the ground that, according to the terms of its policies, it has no duty to defend while primary and/or other insurers have a duty to defend. First State acknowledges that it received notice from Synalloy of two lawsuits on November 23, 1981, but contends that Synalloy never made proper notice or demand to defend with respect to any lawsuits. Correspondence produced by Synalloy indicates that First State's broker received notice of *Sturgis et al. v. Synalloy Corp. et al.*, Civil Action No. 2396 (Rich.Co. State Ct.), and forwarded a copy of the summons and complaint to First State as early as June 16, 1981, though receipt was not acknowledged by First State until January 25, 1982. Copies of complaints in *Allen v. Synalloy Corp.*, as well as in nine other suits, were sent under cover letter to First State, among others. First State concluded, upon investigation, that its policies did not provide coverage and/or defense for the BNA lawsuits. F & C likewise refused to defend the BNA claims, of which it was given notice prior to issuance of the policy. Synalloy employed trial counsel to defend its interests in the suits for which General Accident did not provide a defense and to participate in the actions defended by General Accident.

On July 23, 1981, Continental filed this declaratory judgment action, naming as defendants insurance carriers for Synalloy, American Mutual Liability Insurance Co., Synalloy and certain of the plaintiffs in the tort action. Continental alleges in Count I

---

**4.** Whether this statement accurately characterizes the dispute is open to question. See Transcript of Oral Argument, April 14, 1983, p. 11, lines 14–21. At any rate, the question of the amount of coverage is not before the Court in these motions.

that it has a dilemma with respect to both the duty to defend Synalloy againt BNA claims and the obligation to indemnify Synalloy in the event of judgments, because its duty and liability, if any, may depend upon the duty to defend and liability of other insurers. Furthermore, Continental alleges that the existence and extent of the obligations owed to Synalloy by any one of the defendant carriers may depend upon the obligations of one or more other such defendants. Thus, Continental seeks a declaration as to the existence and extent of its and the other insurers' duties to defend and to indemnify. Count II contains a demand for declaratory relief on Continental's position that General Accident's waiver of Exclusion (e) does not affect Continental's right to rely on Exclusion (e) and that Continental therefore has. no duty to indemnify or defend under Continental Coverage A. Continental asserts in Count III that General Accident has a current and continuing duty to defend Synalloy against the BNA claims regardless of exhaustion of General Accident's limits of liability and that, because of the existence of this continuing duty to defend, Continental has no duty to defend Synalloy. Count V requests the Court to adjudge that under the policy definition of "occurrence" all claims which have, may have been or may be brought against Synalloy alleging exposure to BNA constitute a single "occurrence" for the purpose of application of Continental's limits of liability.

Synalloy counterclaims against Continental seeking actual and punitive damages which allegedly resulted from Continental's breaches of the insurance contract, forcing Synalloy to incur legal expenses, additional insurance expenses and otherwise injuring Synalloy's business. Synalloy also prays for a money judgment on the ground that by virtue of Synalloy's assumption of the defense of the BNA claims, Continental has been benefitted and unjustly enriched. Synalloy cross-claimed against each of the defendant carriers for a declaration that each has the responsibility to defend and indemnify Synalloy under its policy. Columbia Casualty Company and Continental Insurance Company were impleaded by Synalloy as two additional carriers who had issued policies to Synalloy. F & C was later substituted for Continental Insurance Company. In its answer, Synalloy contends that the law of South Carolina applies to the instant action, inasmuch as all contracts between it and the insurers were allegedly made in the State of South Carolina.

### III. Synalloy's Motion for Partial Summary Judgment Against General Accident and Continental

Synalloy has moved for partial summary judgment on its cross-claim against General Accident and on its counterclaim against Continental seeking recovery of all legal fees and expenses incurred in defending the BNA tort suits and the legal fees and expenses incurred in connection with defending the declaratory judgment action. The basis for the motion is Synalloy's contention that General Accident and Continental have an unfulfilled duty to defend Synalloy against the BNA claims under the policies of insurance issued by them to Synalloy.

### III.A. Synalloy vs. General Accident

As previously noted, General Accident has informed Synalloy that once its policy limits of liability ($100,000 total per year, according to General Accident) are exhausted, it will withdraw from the defense of the BNA claims it is then defending and will refuse to defend claims arising thereafter. Synalloy counters with two arguments: (1) that there is no provision in the applicable policies allowing the insurer to terminate the duty to defend when policy limits are exhausted and (2) that the law of South Carolina, which Synalloy asserts is controlling, provides that the duty to defend does not end when policy limits are exhausted. Because of the stance taken by General Accident, Synalloy contends, it has been necessary for Synalloy to retain counsel not only in those cases not defended by General Accident, but also in those cases defended by General Accident, in order to avoid prejudice to it if General Accident does withdraw midstream. Therefore, Syn-

alloy seeks reimbursement of the legal fees paid in connection with the defense of the tort claims in which General Accident is conducting a defense and asks the Court to order General Accident to continue defending these claims even if the underlying limits of its policies are exhausted.

General Accident disputes Synalloy's assertion that Synalloy has been forced to employ trial counsel to defend Synalloy's interests because of the threat of extinction of the duty to defend, declaring instead that General Accident has afforded a defense in those claims within the coverage of its policies and in accordance with the terms, conditions, limitations and provisions of its insurance contracts. According to General Accident, there is a material fact in issue with regard to whether Synalloy's legal expenses were *necessarily* incurred in the cases defended by General Accident, and therefore, summary judgment on Synalloy's claim for reimbursement of defense costs paid to date would be improper. As to Synalloy's contention that the duty to defend continues despite exhaustion of the policy limits, General Accident argues that summary judgment must be denied because Georgia law, which General Accident asserts should control, conclusively provides that the duty to defend is extinguished when the policy limits of liability are exhausted.

### III.B. Court's Discussion and Analysis

Because Synalloy's claim for reimbursement of defense costs depends to an extent upon whether General Accident's threatened *refusal to continue to defend* BNA claims is justifiable or unjustifiable, the Court will first address the choice of law question and the rules governing the insurer's duty to defend under the controlling law.

Despite Synalloy's assertions to the contrary, the choice of law in this case is not necessarily determinative of the outcome on the duty to defend issue. Concededly, there is a split of authority on the question whether the policy limits affect the extent of the duty to defend. *See* 14 Couch on Insurance 2d, § 51:53, at 506; *Commercial*

*Union Ins. Co. v. Pittsburgh Corning Corp.*, 553 F.Supp. 425, 429 n. 11 (E.D.Pa. 1981). Synalloy contends that South Carolina follows the rule that an insurer may not abandon its defense of a claim which is within the terms of the policy or refuse to defend later-arising claims on the ground that the policy limits have been depleted. The leading case cited for this proposition is *American Casualty Co. of Reading, Pa. v. Howard*, 187 F.2d 322 (4th Cir.1951), a declaratory judgment action brought by American Casualty seeking relief from any liability or obligation under its policy. American Casualty had previously satisfied a judgment in a wrongful death case against its insured up to the limits of its personal injury coverage under an automobile liability policy which covered both personal injury and property damage. Thereafter, an action for property damage, *inter alia,* arising out of the same incident was brought against the insured, and American Casualty sought guidance by way of the declaratory judgment action from the court as to its duty to defend this second action. The Fourth Circuit held that American Casualty was obligated to defend the pending suit against its insured, ruling that "[t]here is no merit in the contention of American that, having paid the limit of its coverage for personal injuries and having indicated its willingness to pay for any property damages recovered in this pending suit up to the limit of its property coverage, it has completely fulfilled its obligations under the contract." 187 F.2d at 326. The insurer could not tender the amount of the policy covering property damage and then decline to defend because, "[t]he defense of such suits by the insurer is a valuable right of the insured for which he pays and to which he is entitled by the very words of the policy." 187 F.2d at 327. To hold otherwise, construing the duty to defend as coextensive with and dependent upon the policy's monetary limits would in effect read out the provision of the insurance contract independently promising to defend suits against the insured. *Id.*

The court's language in *American Casualty* is broad and could perhaps lead to the supposition that even an insurer

not on the risk, could be obligated to defend a suit brought against its insured. Clearly, such is not the rule in South Carolina where the law, as in other jurisdictions, provides that the duty to defend is triggered only when the facts alleged in the complaint bring the case within the coverage agreement of the policy. *See, e.g., General Insurance of America v. Palmetto Bank,* 268 S.C. 355, 233 S.E.2d 699, 701 (1977); *Allstate Insurance Company v. Wilson,* 259 S.C. 586, 193 S.E.2d 527 (1972). So holding, the court in *Lyles v. Nationwide Mutual Insurance Company,* 245 S.C. 438, 141 S.E.2d 106 (1965) distinguished *American Casualty:*

> The case of *American Casualty Co. of Reading, Pa. v. Howard, supra,* relied upon and quoted from by the circuit judge, is, we think, clearly distinguishable. In that case there was no contention that the automobile was not covered by the policy. The particular suit involved sought the recovery of two elements of damage with respect to one of which elements of damage the limit of the policy had been previously exhausted. Under these circumstances, the court held that the duty to defend such suit still remained.

*Id.* at 108. The policy limits in *American Casualty* had not been exhausted and thus the case does not stand for the proposition that an insurer must continue to defend after depletion of the policy limits. The important principle established by *American Casualty* is that "[t]he duty to defend is separate and distinct from the obligation to pay a judgment against the insured." *Sloan Construction Co. v. Central National Ins. Co. of Omaha,* 269 S.C. 183, 236 S.E.2d 818, 820 (1977). This means that the insurer must provide a defense even though ultimately, it may not be held liable for the judgment against the insured, if there is "apparent potential liability to satisfy the judgment." *Id.* Moreover, the insurer has a duty to defend even though the *ad damnum* clause demands damages in excess of the policy limits. *Hodges v. State Farm Mut. Auto Ins. Co.,* 488 F.Supp. 1057, 1067 (D.S.C.1980). That is, an insurer potentially on the risk cannot

bow out of the defense of a claim merely because the policy's term for indemnity is limited to an amount less than that sought in the complaint. *Id.* This view is entirely in accord with that often-quoted passage from 8 Appleman, Insurance Law and Practice, § 4685, at 21–22 (1942) (quoted in *American F. & C. Co. v. Pennsylvania Threshermen & Farmers Mut. Cas. Ins. Co.,* 280 F.2d 453, 458 (5th Cir.1960):

> "... [T]he insurer's duty is both to defend actions *and* to pay judgments obtained against the insured. Otherwise, where the damages exceed the policy coverage, the insurer could walk into court, toss the amount of the policy on the table, and blithely inform the insured that the rest was up to him. This would obviously constitute a breach of the insurer's contract to defend actions against the insured, for which premiums had been paid, and should not be tolerated by the courts."

■ None of the cases cited by Synalloy support its bald assertion that South Carolina law mandates maintenance of a defense even after the policy limits are exhausted. It is clear, however, that under South Carolina law, the insurer cannot unilaterally rescind the promise to defend by tendering the policy limits and refusing to defend on the grounds of prior exhaustion of the policy. Withdrawing from the defense or declining to defend a claim arising out of the same occurrence after payment of the policy limits in settlement or satisfaction of judgment entered in a related claim or claims presents a different situation. The Court has found no South Carolina case which addresses this particular situation but notes that insurers are not always obligated to defend until the bitter end. In *Allstate Ins. Co. v. Wilson, supra,* the court found that the insurer's "obligation to defend existed from the time the actions were instituted and continued until it fulfilled its obligations under its policy," and that the insurer's obligation ended when it determined there was no coverage under its policy. *Id.* 193 S.E.2d at 530.

The Georgia Supreme Court has addressed the issue "whether an insurer was

required to defend remaining actions against the insured after it had, with the consent and contribution of the insured, exhausted the policy limit of liability by settling two of the suits arising from the same accident" in *Liberty Mutual Insurance Co. v. Mead Corp.*, 219 Ga. 6, 7, 131 S.E.2d 534 (1963). The court's holding, that "the duty to defend is limited by the amount of liability coverage afforded by the policy," *id.* at 9, 131 S.E.2d 534, was narrow, based as it was on the specific policy language and the particular circumstances presented. The court first observed that the extent of the duty to defend is defined by the insurance contract. *Id.* at 8, 131 S.E.2d 534. The policy which contained the standard automobile liability form language provided that, " 'with respect to such insurance as is afforded by this policy, the company shall: (a) defend any suit against the insured ...,' " *id.* at 8, 131 S.E.2d 534, and expressly made the insuring agreements " '*subject to the limits of liability*, exclusions, conditions and other terms of this policy' " in the first sentence of the policy. *Id.* at 9, 131 S.E.2d 534. (Emphasis in court's opinion). The policy then set forth the various coverages and the standard defense, settlement and supplementary payments clause which began with the language quoted above. It further provided for payment of certain bonds and expenses and stipulated that such expenses and the costs of defense were payable in addition to the applicable policy limits. Viewing the policy as a whole and striving to ascertain the intent of the parties, the court construed the words " 'such insurance as is afforded by this policy' " as referring not only to types of coverage but also to the amount of coverage.

After concluding that the policy limited both liability and the duty to defend, the Georgia court examined the conduct of the insurer to determine whether its duty to defend under the policy had been fulfilled. The court found that it had done so: "with the insured's consent and contribution, the insurer paid the full policy limit of liability in compromise and settlement of two of the claims and suits against its insured, thus defending with reference to 'such insurance' as was afforded by the policy." *Id.* at 10, 131 S.E.2d 534. The court was careful to note that the insured had suffered no prejudice to its rights by the withdrawal of the insurer. The insured's only damage resulted from the incurrence of attorney's fees and expenses in defending the claims for which the insurer had refused to provide a defense. *Id.*

In ruling as it did, the Georgia court concurred in the rationale offered by the New Hampshire court in *Lumbermen's Mutual Cas. Co. v. McCarthy*, 90 N.H. 320, 8 A.2d 750 (1939), which characterized the duty of indemnity as "the primary obligation" of the insurer and the duty to defend as dependent upon that obligation. In adopting this rationale, the Georgia court emphasized that the New Hampshire court had distinguished the factual situation before it from one where the insurer "elects to pay the policy limit and from the beginning casts upon the insured the whole burden of defense, or ... elects to defend rather than to settle and then abandons the defense in midcourse to the prejudice of the insured." *Id.* 219 Ga. at 11, 131 S.E.2d 534. The Georgia court also did not hold that in every situation the duty to defend was dependent upon the duty to indemnify, *see id.* at 11, 131 S.E.2d 534 (discussing New York case construing cases as independent), but so found it in the factual context before it.

The approach taken in *Liberty Mutual* is consistent with the Georgia courts' deference to the contract as defining the limits of the duty to defend. Most courts, like those in South Carolina, follow the rule that the obligation to defend is governed by the allegations of the complaint. *See, e.g., Battisti v. Continental Cas. Co.*, 406 F.2d 1318 (5th Cir.1969); *Baker v. American Ins. Co. of Newark, N.J.*, 324 F.2d 748 (4th Cir.1963). The rule in Georgia is not materially different but is analytically distinctive: "The true rule is that the duty to defend is determined by the contract; and since the contract obligates the insurer to defend claims asserting liability under the policy; even if groundless, the allegations

of the complaint are looked to to determine whether a liability covered by the policy is asserted." *Loftin v. U.S. Fire Ins. Co.*, 106 Ga.App. 287, 294, 127 S.E.2d 53 (1962). *See also, Great American Ins. Co. v. McKemie*, 244 Ga. 84, 85, 259 S.E.2d 39 (1979); *State Farm Mut. Auto. Ins. Co. v. Keene*, 111 Ga.App. 480, 142 S.E.2d 90 (1965).

*Liberty Mutual* involved an insurer's refusal to defend suits filed after prior exhaustion of the policy limits in related cases. In *Allstate Insurance Co. v. Montgomery Trucking Co. of Ga.*, 328 F.Supp. 415 (N.D.Ga.1971), the district court was presented with the question whether the insurer could withdraw its defense in suits pending at the time coverage was exhausted. Basing its decision on *Liberty Mutual*, the court fashioned a cautious response: "Absent a showing of prejudice, plaintiff may ask the insured to shoulder the cost of further defending the remaining suits. ... [O]n the facts herein involved, the court merely holds that the insured will suffer no apparent prejudice by the proper withdrawal of Allstate from the defense of a suit under the Georgia rule and the discretion of the state judge." *Id.* at 416. The district court refrained from commenting on what would constitute prejudice but remarked that excess carriers would assume the burden of defense in the cases before it so that the insured would not suffer apparent prejudice. Since the insurer had not yet withdrawn from any pending suits, the question of "the manner in which to accomplish a smooth transition between legal representatives" was not before the court. *Id.* at 417.

In sum, the choice-of-law question is not determinative of the outcome here, unlike so many cases, because as the Court views the law of these two states, open questions remain. For example, the Court would have to answer questions such as whether a South Carolina court presented with this factual situation would extend the characterization of the duties to defend and indemnify as separate and independent or would follow a rationale like that in *Allstate Ins. Co. v. Wilson*, where the insurer was allowed to withdraw once the lack of coverage was demonstrated, and such as whether, under the law of Georgia, the policies in the instant case limit the duty to defend to the point at which coverage is extinguished and whether the insured would be prejudiced by a withdrawal of the carrier from its defense of pending claims.

██ It is axiomatic that federal courts must follow the conflict-of-law rules of the forum in diversity cases. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Residential Indus. Loan Co. v. Brown*, 559 F.2d 438 (5th Cir.1977). Despite some federal courts' assertions to the contrary, the law in Georgia regarding choice of law in contract cases remains the traditional "place of making" and "place of performance" rules. *See Terry v. Mays*, 161 Ga. App. 328, 291 S.E.2d 44 (1982); Rees, *Choice of Law in Georgia: Time to Consider a Change?*, 34 Mer.L.Rev. 787 (1983). The laws of the place of making govern matters involving the execution, interpretation and validity of a contract. *Rohner, Gehrig & Co. v. Capital City Bank*, 655 F.2d 571, 579 (5th Cir.1981); Rees, *supra*, at 787 n. 3. The place of making is considered to be the place where the contract was delivered or where the last act essential to completion of the bargain is located. *Hayes v. Irwin*, 541 F.Supp. 397 (N.D.Ga. 1982); *Residential Indus. Loan Co., supra*, at 440; *Robinson v. Ravenel Co., Inc.*, 411 F.Supp. 294 (N.D.Ga.1976).

██ According to the affidavit of Don R. Bain,[5] Vice President of Synalloy Corp.,

---

5. Continental objects to the Bain affidavit on the grounds that the affidavit was not properly served, is irregular in that it does not recite that it was made based on personal knowledge, is not made in the "first person" and contains hearsay evidence. The Court notes this objection and agrees that the affidavit of facially defective. The Court may, in its discretion, re-fuse to credit the affidavit. *CMS Industries, Inc. v. L.P.S. International, Ltd.*, 643 F.2d 289 (5th Cir.1981). However, in this case, the Court is not relying on the affidavits to create or dispose of a factual issue or for reasons which could conceivably prejudice the other parties to this suit. Therefore, although the Court does not approve of the manner in which this affidavit

Synalloy is a South Carolina corporation with its principal offices and executive officers located in South Carolina. The insurance policies at issue were delivered to Synalloy at its corporate office in Spartanburg, South Carolina. Hence, it appears that South Carolina was the place of the making of the contracts. Therefore, the law of South Carolina would apply were it not for the Georgia conflict rule that only the statutes and case law interpreting the statutes of another jurisdiction will be applied by Georgia courts. *White v. Borders,* 104 Ga.App. 746, 747, 123 S.E.2d 170 (1961); *Budget Rent-A-Car Corp. v. Fein,* 342 F.2d 509, 513 (5th Cir.1965). In the absence of any pleading and proof of a statute, the common law as it has developed in the State of Georgia will govern the construction of a contract of another state. *Trustees of Jesse Parker Williams Hosp. v. Nisbet,* 189 Ga. 807, 811, 7 S.E.2d 737 (1940); *see also, White v. Borders, supra; Budget Rent-A-Car, supra,* at 513; *Rees, supra,* at 789. Synalloy has not pleaded or proved any foreign statute in support of its argument; hence, the Court is directed to refer to the common law as it exists in Georgia.

 Under *Liberty Mutual Ins. Co. v. Mead Corp.,* the language of the policy

controls the extent of the insurer's duty to defend. Synalloy argues that the policy contains no provision which permits the insurer to refuse to defend after exhaustion of the limits of liability. Such a clause, providing that "the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements," is commonly included in insurance policies, *see, e.g.,* General Accident Fire and Life Assurance Corp. Ltd. General Liability Policy, and could have been included in the workers' compensation and employer's liability policies at issue herein. The intent of the parties would have been apparent then. However, the omission of such specific language (apparently the insurance industry's answer to the problem raised here, *see Commercial Union Ins. Co. v. Pittsburgh Corning Corp.,* 553 F.Supp. 425, 429 (E.D.Pa.1981)) does not automatically lead to the conclusion that the parties intended for General Accident to pursue a defense beyond the limits of its policies. The format of the General Accident workers' compensation and employer's liability policies is much like that of the policy described in *Liberty Mutual.*[6] The introductory sentence to the

was made, it does not find it inherently unreliable and therefore will rely on Bain's affidavit for the limited purpose of the choice of law question.

6. Relevant portions of the policy are as follows:
 [The company] [a]grees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:
 I. Coverage A—Workers' Compensation. To pay promptly when due all compensation and other benefits required of the insured by the workers' compensation law.
 Coverage B—Employers' Liability. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease, including death at any time resulting therefrom....
 II. Defense, Settlement, Supplementary Payments. As respects the insurance afforded by the other terms of this policy the company shall: (a) defend any proceeding against the

insured seeking such benefits and any suit against the insured alleging such injury and seeking damages on account thereof, even if such proceeding or suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; (b) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defendant proceeding or suit, but without any obligation to apply for or furnish any such bonds; (c) pay all expenses incurred by the company, all costs taxed against the insured in any such proceeding or suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon; (d) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the company's request.
 The amount incurred under this insuring agreement, except settlements of claims and suits, are payable by the company in addition to

Insuring Agreements makes the Agreements (including the duty to defend) "subject to the limits of liability, exclusions, conditions and other terms of this policy:." The defense, settlement and supplementary payments clause begins, "As respects the insurance afforded by the other terms of this policy...." The insurer thereafter agrees to defend "any suit against the insured alleging such injury ... even if such ... suit is groundless, false or fraudulent ...," to pay premiums on bonds, expenses, costs, and postjudgment interest, and to reimburse the insured for its expenses incurred at the company's request. The costs of defense are expressly in addition to the limit of liability. Were it not for the initial qualifying statement making the Insuring Agreements "subject to the limits of liability," the Court would be tempted to find the juxtaposed language "insurance afforded by the other terms of this policy" and "any suit ... alleging such injury" ambiguous. *See Commercial Union Ins. Co., supra.* But the intent of the parties to make each of the Insuring Agreements subject to the policy limits of liability is clearly expressed. The Court is, of course, obliged to follow the Georgia rules of construction, the paramount one of which is that "a policy must 'be construed so as to carry out the true intention of the parties.'" *National Hills Shopping Ctr., Inc. v. Liberty Mutual Ins. Co.,* 551 F.2d 655, 657 (5th Cir.1977). That intent must be gleaned from the contract as a whole, *Parris & Son v. Campbell,* 128 Ga.App. 165, 196 S.E.2d 334 (1973), and the Court may not " 'stretch[ ] for ambiguity when it is not there.'" *National Hills, supra,* at 658. The Court may not pass judgment on the wisdom or reasonableness of the rule annonced by the Georgia court. I note that the Georgia court in *Liberty Mutual* was careful to restrict its holding to the facts of the case before it, where there was no prejudice to the insured whose only damage was monetary. Also, in *Liberty Mutual,* the exhaustion of the policy was with the consent of the insured. To an extent, therefore, the insured may be able to control the point at which the policy is ex-

hausted and the duty to defend extinguished, depending of course upon the insured's willingness to gamble that a judgment will not exceed the policy limits. At any rate, a comparison of the General Accident policy language and that quoted in *Liberty Mutual* leads to the conclusion that General Accident's duty to defend is coextensive with the limits of liability contained in the workers' compensation and employer's liability policy. That this is so does not mean that General Accident may tender the policy limits and walk away from its obligation under the policy to provide a defense. If and when the policy limits are exhausted by payment of judgments or settlements and if General Accident has at that time fulfilled its obligations to Synalloy, then General Accident may justifiably decline to defend Synalloy against later filed BNA claims. The question posited in *Allstate Insurance,* whether the insurer may also withdraw midcourse from then-pending lawsuits arising from the same occurrence, must likewise be determined at the point of exhaustion of the policy limits. Chief among the considerations must be potential prejudice to the insured. The question of what constitutes prejudice sufficient to bind the insurer to its defense may be pretermitted for the present. The availability of excess insurers to defend the claims is certainly a significant factor.

■ In denying Synalloy's motion for partial summary judgment on the issue of the extent of General Accident's duty to defend, the Court must again mention its qualms regarding the prematurity of the motion. General Accident has not exhausted its policy limits, attempted to withdraw from pending suits or refused to defend others on the ground of prior exhaustion of the limits of liability, so far as the Court knows. Moreover, and most significantly, there is a dispute over the amount of the policy limits of liability. And these are not the only issues lurking in this litigation. The Court can only follow the approach taken in *Allstate Insurance Co. v. Mont-*

the amounts payable under coverage A or the

applicable limit of liability under Coverage B.

*gomery Trucking, supra,* and emphasize that at such time as depletion of the policy limits occurs and withdrawal or refusal to defend is imminent, careful consideration should be given to the questions of prejudice to the insured, fulfillment of the duty to defend, and "the manner in which to accomplish a smooth transition between legal representatives." *Id.* at 417.

Because General Accident's legal position is sustained, though not unconditionally, partial summary judgment on Synalloy's claim for reimbursement of legal expenses clearly must be denied. As for Synalloy's request for an award of attorney's fees incurred in defending the declaratory judgment, the Court hereby serves notice that it will take up the question of a party's entitlement, if any, to attorney's fees in connection with this declaratory judgment action at a more propitious point in the litigation. The deferral of a ruling on this demand for attorney's fees applies as well to Synalloy's motion for partial summary judgment against Continental and motion for summary judgment against First State and F & C.

### III.C. *Synalloy vs. Continental*

By its motion for partial summary judgment against Continental, Synalloy seeks a determination that Continental has a current duty to defend the BNA tort claims. Continental issued two separate excess liability policies covering the policy periods from August 31, 1969 to August 31, 1972 and August 31, 1972 to August 31, 1975.[7] Although Synalloy originally moved for partial summary judgment on the defense obligations under both types of coverage provided in the Continental policies, Coverage A—Excess Liability Indemnity and Coverage B—Excess Liability Indemnity Over Retained Limit, and on the Defense Coverage Endorsement, counsel for Synalloy stated at the April 14 hearing that Synalloy was not moving for summary judgment on Coverage A but only on the defense obligations under Coverage B. Since the Defense Coverage Endorsement

is an extension of Coverage A only, Synalloy's motion with regard to that portion of the policy is deemed retracted.

Synalloy's argument with respect to Continental's defense obligations is that Continental cannot bring a declaratory judgment action pleading uncertainty concerning the extent to which BNA claims are covered or excluded by its policies and simultaneously assert that it has no current duty to defend those tort claims, because an insurer is obligated to defend whenever claims are potentially within the coverage of its policy. Furthermore, argues Synalloy, Continental cannot avoid this duty by relying on the underlying insurer's defense of the claims because General Accident is not defending all of the claims, is defending others under a reservation of rights and has notified Synalloy that its duty to defend would cease upon exhaustion of the policy limits. Nor should the disputed fact that other insurers, *e.g.,* First State and F & C, have duties to defend which Synalloy is trying to enforce prevent Continental from fulfilling its duty to defend under the policy, according to Synalloy. Because of this allegedly unjustifiable refusal of Continental to provide any defense of the BNA claims, Synalloy moves that Continental be ordered to reimburse Synalloy for all defense costs incurred by Synalloy to date and to assume defense of all the BNA tort cases.

Continental's response to Synalloy's arguments is multifold. Its defense obligation, under Excess Coverage B, contends Continental, is limited by the policy language as well as by "other insurance" clauses and therefore, because of the current defense by General Accident as well as the availability of other insurance with concomitant duties of defense, Continental is not presently obligated to defend the BNA claims. Moreover, as an excess insurance carrier, according to Continental, its duty to is not triggered as long as the claims are defended by a primary insurer.

---

**7.** It appears that Synalloy limits its motion to the earlier policy. See Synalloy Memorandum in Support of Motion for Partial Summary Judgment at 4.

### III.D. Court's Discussion and Analysis

██ With Continental's assertion that the record is incomplete in some crucial respects, the Court can readily agree without prolonged discussion. Synalloy has moved for reimbursement of legal expenses it has incurred but the record contains no data indicating the number or identity of claims defended by General Accident and no detailed accounting of fees and expenses incurred or paid in defending the claims.[8] In addition to the lack of a sufficient foundation for the motion, the timing of the motion is inappropriate. The purpose of this declaratory judgment action, at least from the Court's point of view, is carefully, methodically and with an eye toward practical solutions to provide some guidance and order for the parties; to determine whether, to what extent and when each carrier is on the risk; and in the process, to issue rulings on such questions as the mechanism by which coverage is triggered and the means by which liability and the burden of defense will be shared. In order to preserve that end, the Court will tread lightly and withhold ruling on matters which could disrupt the efficient and orderly process of concluding this litigation. To issue an order granting or denying reimbursement of Synalloy's legal expenses could ill-serve the parties to this action and thwart the aforementioned purposes. Partial summary judgment on Synalloy's claim for reimbursement of legal expenses incurred thus far is therefore denied.

The insuring agreement on which Synalloy relies and the policy definitions applicable thereto are as follows:

> The company designated in the declarations (a stock company, herein called the company) in consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the insured named in the declarations as follows:
>
> COVERAGE B—EXCESS LIABILITY INDEMNITY OVER RETAINED LIMIT
>
> The company will indemnify the insured, with respect to any occurrence not covered by underlying insurance, or with respect to damages not covered by underlying insurance, for ultimate net loss in excess of the insured's retained limit which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law or assumed by the insured under any contract because of personal injury, property damage, or advertising injury to which this coverage applies, caused by an occurrence. The company, with respect to an occurrence not covered in whole or in part by underlying insurance or to which there is no other insurance in any way applicable, shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury, property damage or advertising injury, even if any of the allegations of the suit is groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted.

\* \* \* \* \* \*

> Condition 10:
>
> Other Insurance: If, with respect to loss and ultimate net loss covered hereunder, the insured has other insurance, whether on a primary, excess or contingent basis, there shall be no insurance afforded hereunder as respects loss and ultimate net loss; provided, that if the limit of liability of this policy is greater than the limit of liability provided by the other insurance, this policy shall afford excess insurance over and above such other insurance in an amount sufficient to give the insured, as respects the layer of coverage afforded by this policy, a total limit of liability equal to the limit of liability afforded by this policy.
>
> This condition does not apply with respect to the underlying insurance or ex-

---

**8.** The affidavit of Don Bain is wholly inadequate for this purpose.

cess insurance purchased specifically to be in excess of this policy.

* * * * * *

"retained limit" means the amount stated in item 4 of the declarations or another collectible insurance (other than underlying insurance or insurance purchased specifically in excess of this policy) which is available to the insured. In the event the amount of said other collectible insurance is less than the amount stated in item 4 of the declarations, the insured shall retain for his own account the difference between the amount available to him from said other collectible insurance and the amount stated in item 4 of the declarations;

"ultimate net loss" means the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable after making deductions for all other recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy and also includes investigation, adjustment, appraisal, appeal and defense costs paid or incurred by the insured with respect to damages covered hereunder. "Ultimate net loss" does not include (a) costs and expenses which an underlying insurer has paid or incurred or is obligated to pay to or on behalf of the insured, (b) office costs and expenses of the insured and salaries and expenses of employees of the insured or (c) general retainer fees of counsel retained by the insured;

At the risk of oversimplifying the agreement, in more distilled language these contractual provisions contain an agreement by the insurer to pay the ultimate net loss in excess of the retained limit ($10,000.00) to the insured for occurrences not covered by General Accident or covered, but not fully compensable. "Ultimate net loss" includes defense costs paid or incurred by the insured. However, under Condition 10, whether ultimate net loss will be paid depends upon the existence or lack of other insurance, primary, excess or contingent, excluding the underlying insurance and excess insurance purchased specifically in excess of Continental's policy. In addition to Condition 10, which applies to defense costs *paid or incurred by the insured* by virtue of the definition of "ultimate net loss," the company's duty to defend is delimited by the existence of other insurance. That is, Continental agrees to defend those claims included within the creating language of the indemnity agreement as to which "there is no other insurance in any way applicable."

Construing the contract as it would reasonably be understood by the insured, there are, then, two "other insurance" conditions, one applicable to the legal expenses and defense costs incurred or paid by the insured and one which applies to the insurance company's defense obligations. Condition 10 becomes operative at the point of indemnification, when the company is considering its liability under Coverage B, whereas the "other insurance" proviso in the language creating the duty to defend presents a threshold question for the insurer, at the outset of determining its obligation under Coverage B. Condition 10 clearly bears on Synalloy's claim for reimbursement of defense costs paid or incurred to date insofar as they would be included in the ultimate net loss indemnifiable by Continental, a claim on which partial summary judgment has heretofore been denied. The Court's discussion of "other insurance" will therefore be limited to the latter provision.

■ Continental makes two arguments with respect to General Accident's defense obligations: (1) that General Accident, as the underlying insurer, is currently providing a defense of the tort claims and therefore under the Coverage B defense agreement, Continental has no duty to defend and (2) that General Accident, as the primary insurer, is primarily responsible for the provision and costs of defense as a matter of law. General Accident has defended or is currently defending only those claims which appear to be within its policy coverage. The Court has not been apprised of certain salient facts concerning

General Accident's defense and concerning the existence of other underlying insurance. It is clear, however, that General Accident's position that some BNA claims are not covered by its policies triggers Continental's Coverage B indemnity agreement as well as its duty to defend, if there is not applicable other insurance (and, of course, if the occurrences are within Continental's policy periods).

■ With respect to Continental's argument that an excess insurer has no duty to defend those claims being defended by a primary insurer, "the general rule is that an excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted. But if the primary insurer denies coverage, the excess insurer would be obligated to defend." 14 Couch on Insurance 2d, § 51:36, at 446. The law in Georgia is not to the contrary.[9] The Georgia Court of Appeals in *Commercial Union Ins. Co. v. Insurance Co. of North America*, 155 Ga.App. 786, 273 S.E.2d 24 (1980), a case involving an automobile liability policy with an "excess" clause, noted that "As INA is the primary insurer, it also has the primary duty to defend the driver," *id.* at 790, 273 S.E.2d 24, citing in support a Florida case, *Aetna Casualty & Surety Co. v. Market Insurance Co.*, 296 So.2d 555 (Fla.App. 1974). In that case, National Car Rentals, Inc. self-insured up to $25,000 and contracted with Market Insurance Co. for excess coverage. The court there held that "National Car Rental Systems, Inc., being the primary insurer, had the primary duty to defend [the insured] up to the limit of its liability, to wit: $25,000. When it became apparent that the liability would exceed this limit, then Market, as the 'excess insurer,' was obliged to take over the legal representation from National." *Id.* at 558. At what stage it becomes apparent that

liability will exceed the limits of the primary policy, triggering the duty to defend of the excess carrier, is not clear because Market defended the insured from the outset. No Georgia case addressing this question has been found by this Court.

■ However, this question need not be finally resolved, in the Court's opinion. It is true that some courts "have held that the excess carrier must participate in the defense and share in the cost of defense when it is clear that the potential judgment against the insured may be substantially greater than the amount of the primary policy limits." 14 Couch on Insurance 2d, § 51:36, at 446. Such a holding in this case would fly in the face of the policy language and would seem to be contrary to Georgia law. In the context of this case, therefore, the Court is in agreement with the California court in *Signal Companies v. Harbor Insurance Co.*, 27 Cal.3d 359, 165 Cal.Rptr. 799, 612 P.2d 889 (1980) which, in considering the primary carrier's argument that an excess insurer should be obligated to participate in the defense when notified that a tort claim might invade excess coverage, commented that acceptance of this position "essentially would make Harbor [excess] a coinsurer with Pacific [primary] with a coextensive duty to defend." *Id.* 165 Cal.Rptr. at 803, 612 P.2d at 893. Where the insured purchases one policy specifically as primary coverage and another specifically as excess coverage, equating the two companies' defense duties as a matter of law would reform the contracts. That is not to say that there are not cases in which the best interests of the excess insurer may be to participate in the defense from the outset, while in other cases, a smooth transition from one defense team to another may suffice. As long as the obligation to defend, as written

**9.** The Georgia cases which hold that whether an insurer is "a primary or excess carrier, its obligation to defend is the same under the contract," *Home Indemnity Co. v. Godley*, 122 Ga. App. 356, 363–64, 177 S.E.2d 105 (1970); *Associated Petroleum Carriers, Inc. v. Pan American Fire & Cas. Co.*, 117 Ga.App. 714 (1968); *United States F. & G. v. Watson*, 106 Ga.App. 748, 752, 428 S.E.2d 515 (1962); *National Surety Corp. v.*

*Dunaway*, 100 Ga.App. 842, 112 S.E.2d 331 (1959) are not pertinent to the point addressed here. All of these cases involve policies with excess clauses or coverage and defense agreements which are *not* expressly made excess, as is Continental's duty to defend. See also *American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers Mutual Cas. Ins. Co.*, 280 F.2d 453, 458 (5th Cir.1960).

and reasonably understood by the insured, is satisfied, this Court need not pinpoint the precise moment of transition of the burden of defense.

 At this point, several observations can be made. Assuming that Continental is on the risk under one or both of its policies (*i.e.,* if the allegations of the complaints or the true facts set forth a possibility of coverage under the Continental policies), Continental does have a current duty to defend under Coverage B those claims for which General Accident has denied coverage and will have a duty to defend those claims from which General Accident withdraws (if allowed to do so) or as to which General Accident refuses to initiate a defense because of exhaustion of its limits of liability, *unless* there is other insurance in any way applicable or unless the other insurance proviso is deemed inoperative, as urged by Synalloy. These conclusions are dictated by the policy as reasonably construed and by the law. The initial "assumption" and the ultimate "qualification" render these conclusions meaningless at this point, however, insofar as practical application is the goal.

 Continental raises two arguments pertinent to the coverage question and the other insurance question. First, it should be noted that the existence and extent of Continental's duty to indemnify Synalloy for BNA claims is an ultimate issue in this case and one which is not before the Court at this moment. Moreover, it is not necessary for purposes of this motion to determine whether coverage exists under Continental's policies and, if so, to what extent, because (pretermitting the other insurance issue) the policy requires Continental to defend even groundless, false or fraudulent claims. Despite the possibility that "the true facts show no coverage," *Great American Ins. Co. v. McKemie,* 244 Ga. 84, 85, 259 S.E.2d 39 (1979), the insurer must defend as long as there is a possibility of coverage, liberally construing the allegations. 14 Couch on Insurance 2d, § 51:42, at 452. Of course, where the complaint on its face seeks recovery for injuries not covered by the policy, the insurer

has no duty to defend. *McKemie, supra; Morgan v. New York Cas. Co.,* 54 Ga.App. 620, 188 S.E. 581 (1936). An onerous burden is not placed on the insurer by these well-accepted rules. The insurer may protect itself from waiver of any of its rights if a defense is conducted and from liability for unjustifiable refusal to defend if none is conducted, while still protecting the interests of its insured, by following the course set forth in *Richmond v. Georgia Farm Bureau & Co.,* 140 Ga.App. 215, 231 S.E.2d 245 (1976) and *State Farm Mut. Auto. Ins. Co. v. Wheeler,* 160 Ga.App. 523, 287 S.E.2d 281 (1981): Upon discovering facts "possibly constituting grounds of noncoverage," *Richmond,* at 218, 231 S.E.2d 245, the insurer, before tendering a defense, should seek the cooperation of its insured in entering into a bilateral reservation of rights agreement, or, barring that, should give proper unilateral notice of reservation and nonwaiver of rights, undertake a defense in order to avoid default, and seek declaratory relief on the question of coverage. This is the prescribed course of action for insurers in Continental's position of uncertainty with regard to coverage.

Thus, the crucial issue concerns the existence of other insurance in any way applicable to the BNA claims and the validity of such a provision. Continental correctly points out that by cross-claims and third-party complaints, Synalloy seeks to enforce the various insurers' assertedly operative duties of indemnity and defense. In particular, Synalloy has moved for summary judgment against First State and F & C with respect to their duties to indemnify and defend. The alleged availability of these other insurances with current defense duties constitutes "other insurance in any way applicable" and insulates Continental from any present duty to defend, argues Continental. Because the resolution of this issue depends to some extent upon the outcome in Synalloy's motion for summary judgment against First State and F & C, the Court will turn to its discussion of that motion.

#### IV. Synalloy's Motion for Summary Judgment Against First State and F & C

Synalloy has moved for summary judgment on its cross-claim against First State and on its third-party complaint against F & C, asserting that under their respective policies, each insurer is obligated to indemnify Synalloy for losses, if any, resulting from the BNA tort claims and to defend Synalloy in these actions.

#### IV.A. Synalloy vs. First State

First State issued two umbrella liability policies to Synalloy, the first covering the May 3, 1980 to January 1, 1982 policy period. The second policy was issued January 1, 1982 and was cancelled by Synalloy effective April 8, 1982. Both policies provided excess coverage. In support of its argument that First State is obligated to indemnify and defend, Synalloy refers to the following provisions of the First State policies:

FIRST STATE INSURANCE COMPANY (hereinafter the Company) Agrees with the INSURED, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

COVERAGE

To indemnify the INSURED for ULTIMATE NET LOSS as defined hereinafter in excess of RETAINED LIMIT, as herein stated, all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:

A. PERSONAL INJURY, as hereinafter defined: ... to which this policy applies, caused by an OCCURRENCE, as hereinafter defined, happening anywhere in the world.

II. UNDERLYING LIMIT—RETAINED LIMIT

The Company shall be liable only for the ULTIMATE NET LOSS in excess of the greater of the INSURED'S:

A. UNDERLYING LIMIT—an amount equal to the limits of liability indicated beside the underlying insurance listed in the Schedule A of underlying insurance, plus the applicable limits of any other underlying insurance collectible by the INSURED; or

B. RETAINED LIMIT—The amount specified in item 3 I B of the Declarations as the result of any one occurrence not covered by said underlying insurance, and which shall be borne by the INSURED.

IV. DEFENSE—SETTLEMENT

A. With respect to any OCCURRENCE not covered, as warranted by the underlying policies listed in Schedule A hereof, whether collectible or not, or not covered by any other underlying insurance collectible by the INSURED, but covered by the terms and conditions of this policy, except for the RETAINED LIMIT stated in item 3 I B of the Declarations, the Company shall:

1. defend any suit against the insured alleging PERSONAL INJURY, PROPERTY DAMAGE or ADVERTISING INJURY or DAMAGE and seeking damages therefore, even if such suit is groundless, false or fraudulent but the COMPANY may make such negotiation or settlement of any claim or suit as it deems expedient. The INSURED shall promptly reimburse the COMPANY for any amount paid in the satisfaction of cases defended hereunder within the retained limit after making proper deduction for all recoveries and salvage collectible, but excluding all loss expense and legal expense.

OCCURRENCE

With respect to Coverage I(A) and I(B) "OCCURRENCE" shall mean an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the IN-

SURED. For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one OCCURRENCE ...

PERSONAL INJURY:

The term PERSONAL INJURY wherever used herein means:

(1) bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom, mental anguish and mental injury ... which occurs during the policy period.

ULTIMATE NET LOSS:

Means the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the INSURED is legally liable after making deductions for all other recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy and also includes investigation, adjustment, appraisal, appeal and defense costs paid or incurred by the INSURED with respect to damages covered hereunder. "ULTIMATE NET LOSS" does not include (a) costs and expenses which an underlying insurer has paid or incurred or is obligated to pay to or on behalf of the INSURED, (b) office costs and expenses of the INSURED and salaries and expenses of employees of the INSURED or (c) general retainer fees of counsel retained by the INSURED.

Synalloy contends that these contractual agreements and definitions give rise to a duty on the part of First State to indemnify Synalloy for losses attributable to the BNA tort claims and to defend Synalloy in these actions because the BNA plaintiffs allege not only physical injury but also seek recovery on a separate basis for the injury to their peace, feelings and happiness which allegedly occurred in January, 1981, when they learned the carcinogenic effects of BNA. Since General Accident denies coverage for some of the claims, is defending others under a reservation of rights, and may deny coverage for others after exhaustion of its policy limits, First State's coverage under II.B. for "any one occurrence not covered by said underlying insurance" is, according to Synalloy, currently applicable as is the obligation to defend under IV.A.1. (As First State's coverage is excess only, either over the underlying limit or retained limit, implicit in Synalloy's argument is the assertion that there is no applicable underlying insurance which applies *to the claims as to which Synalloy seeks indemnity and defense from First State.*) In a nutshell, Synalloy's argument is as follows: Personal injury, according to the policy definition, includes mental anguish and mental injury; the policy explicitly limits its coverage to personal injury which occurs during the policy period; the mental injury for which the BNA claimants seek redress allegedly occurred within the policy period. Therefore, argues Synalloy, judgment should be entered in its favor and against First State on Synalloy's cross-claim and First State should be ordered to reimburse Synalloy for defense costs incurred to date in the tort actions, to defend the BNA claims, and to accept its contractual indemnity obligations.

First State raises a number of defenses, procedural and contractual, as well as a vigorously asserted contention that its duties cannot be determined until a decision has been reached on the mechanism which triggers policy coverage, *i.e.*, exposure to BNA or manifestation of disease. Despite this welter of defenses, First State manages to side-step the question presented by Synalloy's motion which focuses on the narrow issue whether First State has a duty to indemnify and defend with respect to the claims that the BNA plaintiffs suffered mental injury due to the concealment until January, 1981, of the hazardous qualities of BNA.

*IV.B. Court's Discussion and Analysis*

The Court is in agreement with First State's assertion that Synalloy's motion is generally lacking in that degree of specificity which is desirable in a motion for sum-

mary judgment. And the Court finds here, as it previously has in considering the motion for partial summary judgment, that this lack of specificity in the record precludes entry of judgment on Synalloy's claim for reimbursement of defense costs incurred in defending the actions.

■ First State's protestations that it did not receive notice of any of the BNA lawsuits except those filed by Walter Holmes and Joe Roberts are effectively quashed by the correspondence produced which demonstrates receipt of notice of many of the other claims. First State cannot be heard to complain of ignorance which by its own efforts was entirely avoidable. Likewise, the alleged lack of formal demand to defend should not prevent a finding that First State's duty to defend is operative, since it does not appear that a formal demand is required by the contracts of insurance. Certainly, First State has pointed to no such requirement. Nor does it appear that rectifying the alleged failure of Synalloy to make such a formal demand would result in any change in First State's position that it owes no current duty to defend or indemnify.

■ First State's defenses based on exclusions within its policies may be quickly dismissed. The worker's compensation exclusion (Exclusion A) has been judicially excised at least as to Synalloy or Augusta Chemical employees whose employment ended prior to 1971. *Hall v. Synalloy Corp.*, 540 F.Supp. 263 (S.D.Ga.1982). First State's argument that by virtue of Exclusion I–III, even if coverage under its policies is applicable, it is restricted to the same extent as General Accident's underlying policy is clearly meritless. The exclusion provides as follows:

I. this policy shall not apply, unless insurance is provided by a policy listed in the schedule of underlying insurance, and then for no broader coverage than is afforded by such insurance:

II. to liability of any INSURED or any employee of said INSURED with respect to personal injury to or death of another employee of the same employer injured in the course of such employment.

This exclusion plainly applies to liability, vicarious or primary, arising out of the injury or death of a Synalloy employee caused by another Synalloy employee in the course of employment. It does not act as a general restriction of First State's coverage to the extent of General Accident's coverage. First State makes two substantive arguments: (1) that the BNA claims do not constitute "occurrences" as defined in the First State policies, because "occurrence" refers to the date of exposure to BNA rather than the manifestation of illness and since exposure occurred, if at all, prior to April 9, 1972, when Synalloy ceased using BNA, First State's policies, operative for 23 months during 1980–1982, are not applicable to the BNA claims; and (2) that the First State policies do not provide coverage because there is underlying insurance available and for the same reason the company is not required to defend the BNA claims.

■ It is true that, in considering the issue "whether insurance liability for injury from a cumulative, progressive disease, *such as asbestosis*, should be apportioned among various insurers on a pro rata basis according to an 'injurious exposure' approach or, instead, should be applied to only one of the insurers under a 'first manifestation' theory," the Fifth Circuit in *Porter v. American Optical Corp.*, 641 F.2d 1128, 1142 (5th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (emphasis added), construed (under Louisiana law) policy language nearly identical to that contained in the policies at issue here to require application of the "'injurious exposure'" theory. *Id.* at 1145. In so holding, the *Porter* court adopted without discussion the reasoning of the Sixth Circuit which had reached the same result in *Insurance Company of North America v. Forty-eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), a case also involving asbestos and its disease-causing properties. The court's approach in *Forty-Eight Insulations* demonstrates why the contract interpretation there and in *Porter* is not con-

trolling in every case involving occupational disease, despite the similarity of policy language. That is not to say that the exposure theory may not eventually be found applicable to the BNA claims, only that this Court cannot so conclude without further inquiry into evidence not yet before the Court.

Clearly, "[t]he adoption of one theory or another is a matter of contract interpretation," *National Service Indus., Inc. v. Hartford Accident & Indemnity Co.*, 661 F.2d 458, 463 (5th Cir. Unit B 1981). The rules of contract interpretation vary from state to state as the court recognized in *National Service. Id.* Much more significant that this legal distinction is the fact that the essential underpinning of the court's decision in *Forty-Eight Insulations* was the medical evidence that supported application of the exposure theory. *See* 633 F.2d at 1217, 1218–20, 1222. For instance, the court noted that "there is universal medical agreement that the time when asbestosis manifests itself is not the time when the disease occurred," *id.* at 1219, and that "[t]he medical testimony strongly supports the exposure theory." *Id.* at 1218.

In contradistinction to the courts which heard other *Forty-Eight Insulations* and *Porter* cases, this Court has not been afforded the benefit of thorough, well-presented medical testimony and therefore has nothing [10] upon which to base an assessment, as was done with asbestosis, of the properties of the disease-causing agent. I have no intention of issuing any opinion on the question of the coverage-triggering theory without such medical testimony and am foreclosed from simply adopting the theory used in *Porter*.

Moreover, Synalloy argues that this question of the theory of liability need not be reached here because the claims which contend First State has coverage are for the mental injury allegedly suffered by the claimants when they learned of the dangers of exposure to BNA. In essence, Synalloy argues that such an injury is inconsistent with an exposure-based definition of occurrence because such injury did not and could not have existed at all prior to January, 1981, when the claimants were first informed of the possible effects of exposure to BNA. This claim for damages for mental injury is distinct (indeed it comprises a separate count and is plead alternatively in the *addamnum* clause) from the claim concerning physical injury. That is, rather than seeking recovery only for mental anguish flowing from the discovery of existing physical injury, the BNA claimants seek a separate recovery for injury to feelings, manifested in January, 1981, caused by Synalloy's alleged acts. Such allegations may or may not state a cause of action; [11] that question is, of course, irrelevant since First State agreed to defend any suit alleging personal injury (including mental injury) "even if such suit is groundless, false or fraudulent," long as the occurrence is not covered by any underlying insurance.

The Court is persuaded by Synalloy's argument. As the court said in *Forty-eight Insulations*, "The insurance policies which we must interpret are meant to protect a manufacturer from products liability judgments. The legal theory used in the underlying tort suits is certainly relevant in helping a court define what was meant by the policy language." 633 F.2d at 1219 n. 12. The suits seek recovery, in part, for mental injuries which did not exist until discovery, in January of 1981, of the hazards of exposure to BNA. The injury thus occurred in the policy period, as required by the First State policy. Therefore, coverage exists as to these mental injury claims *if* there is not underlying insurance. *See* discussion *infra*. The duty to indemnify and defend may be limited by the rule that

> [w]here a complaint in an action against one to whom a policy of liability insur-

---

**10.** First State produced some medical literature including an article on the cancer-causing qualities of BNA. The Court would be seriously remiss in its duties if it relied on such scant evidence to reach a decision on such a crucial question as the coverage-triggering mechanism.

**11.** *See Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir.1981).

ance has been issued states different causes of action or theories of recovery against the insured, and one such cause is within the coverage of the policy but others may not be within such coverage, the insurer is bound to defend with respect to those which, if proved, are within the coverage.

14 Couch on Insurance 2d, § 51:47, at 482; *see also,* cases annotated at 41 A.L.R.2d 434. The Court has found no Georgia case specifically citing this general rule; however, the Court is confident that the courts of Georgia would have no quarrel with such a premise. As exemplified by cases such as *Liberty Mutual Ins. Co. v. Mead Corp.,* 219 Ga. 6, 131 S.E.2d 534 (1963) (duty to defend extinguished when policy limits exhausted), *Loftin v. United States Fire Ins. Co.,* 106 Ga.App. 287, 127 S.E.2d 53 (1962) (true rule is that duty to defend is determined by contract, not by complaint) and cases following *Loftin, e.g., State Farm Mut. Auto. Ins. Co. v. Keene,* 111 Ga.App. 480, 142 S.E.2d 90 (1965) (duty to defend triggered if allegations or true facts known to insurer indicate coverage), the Georgia courts have exhibited extraordinary deference to the terms of the contract of insurance. The rule stated by Couch is but a corollary of the contract principle that neither courts nor the contracting parties can extend a contract further than its intended bounds.

■ So, unless First State's argument that Synalloy has not established a lack of underlying insurance for these mental injury claims is correct, then there is coverage for those claims under First State's policies as well as a defense obligation. First State's characterization of its policy obligations as strictly excess is based on Insuring Agreements I and IIA (*supra*) and on the following provisions:

When underlying insurance, whether or not listed in Schedule A, does apply to an OCCURRENCE, the COMPANY shall have no duty to pay defense, investigations, settlement or legal expenses covered by such underlying insurance; however, the COMPANY shall have the right and opportunity to associate with the INSURED and any underlying insurer in the defense and control of any claim or suit reasonably likely to involve the COMPANY under this policy.

Payment of ULTIMATE NET LOSS: Coverage under this policy shall not apply unless and until the INSURED, or the INSURED'S underlying insurer, shall be obligated to pay the unt of the UNDERLYING LIMIT or RETAINED LIMIT on account of PERSONAL INJURY, PROPERTY DAMAGE or ADVERTISING INJURY or DAMAGE. When the amount of ULTIMATE NET LOSS has finally been determined, the COMPANY shall promptly indemnify the INSURED amount of ULTIMATE NET LOSS falling within the terms of this policy.

Underlying Insurance: If underlying insurance applicable in any one OCCURRENCE is exhausted by payment of judgment or settlement on behalf of the INSURED, the COMPANY shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the INSURED resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another insurer.

These provisions apply unless there is no underlying insurance, in which case the provisions relied upon by Synalloy (including Insuring Agreements I and II.B.), which are set forth above, become operative. It should be noted that *payment* of ultimate net loss is conditioned upon a preexisting obligation of the insured or its underlying insurer to pay the retained limit or the underlying policy limits. The existence or lack of underlying insurance is therefore a material fact which, if in issue, will prevent the entry of summary judgment against First State. The Court has already discussed the duty of an excess carrier to defend where there is a primary insurer, noting that under Georgia law, General Accident, as the primary insurer, has the primary duty to defend. Where, however, the primary carrier denies coverage, the excess insurer's duty under its

policy is triggered, even if there is uncertainty with regard to coverage. Synalloy has repeatedly asserted that General Accident has denied coverage on many claims including claims allegedly within the periods covered by the policies addressed herein and that General Accident has not conducted any defense in those cases. Nothing in the record reflects whether General Accident has denied coverage as to the mental injury claims [12] under its policies effective during 1980–1982. Mere allegations that General Accident has denied coverage under the relevant policies will not suffice. The Court is not free to assume based on counsel's assertions that Synalloy has demanded that General Accident defend and indemnify with regard to the mental injury claims nor that General Accident has denied coverage, justifiably or unjustifiably. Without evidence in the record, it is impossible for the Court to ascertain whether underlying insurance exists or not and there is therefore a substantial and genuine issue as to this material fact. Summary judgment against First State must be denied.

### IV.C. Synalloy vs. F & C

■ Synalloy's motion for summary judgment against F & C, which issued an excess policy to Synalloy on April 18, 1982 to be effective until January 1, 1983, is predicated upon the tort claimants' assertion that they "have suffered great pain of body and mind and will continue to suffer great pain of body and mind, now and in the future." [13] Relying on the policy provisions set forth below, Synalloy contends that these allegations trigger coverage and a current duty to defend under the F & C policy.

F & C's policy provides:

This policy applies only to personal injury, property damage and advertising injury happening during the policy period.

I Coverage

To pay on behalf of the insured the ultimate net loss, in excess of the applicable underlying or retained limit, which the insured shall become legally obligated to pay as damages because of

(A) Personal injury ...

to which this policy applies, caused by an occurrence.

II Defense, Settlement, Supplementary Payments

When underlying insurance exists, the company shall have the right but not the obligation to participate at any time in the defense of any suit against the insured.

When an occurrence is not covered by the underlying insurance listed in the underlying insurance schedule or any other underlying insurance collectible by the insured, but covered by the terms of this policy, without regard to the retained limit contained herein, the company in addition to the applicable limits of liability shall:

(a) defend any suit against the insured even if any of the allegations thereof are groundless, false or fraudulent, but the company may make such investigation and settlement of any claim or suit as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements....

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising injury neither expected nor intended from the standpoint of the insured. "Personal injury" means bodily injury, sickness, disability, disease or death, shock, mental anguish and mental injury.

Synalloy's argument is essentially an extension of its argument in support of its motion for summary judgment against First State (but see footnote 13): that the

---

12. The Court expresses no opinion on the question whether these mental injury claims are within General Accident's coverage.

13. It should be noted that this is not clearly a separate mental injury claim as is the claim discussed above with regard to Synalloy's motion against First State.

claims of mental injury constitute an occurrence (or occurrences) within F & C's policy period and therefore coverage and likewise the duty to defend is triggered. Once again, by merely asserting that General Accident, the primary insurer, has denied coverage and therefore refuses to defend under its 1982 policies,[14] Synalloy seeks to avoid the excess nature of F & C's obligations. And once again, the Court must decline, on such a paltry record, to rule in Synalloy's favor on this motion for summary judgment (assuming and not deciding that its claim against F & C will be treated as identical to the claim against First State). When policy obligations are conditioned on the lack of underlying insurance, there must be a showing that there is indeed no underlying insurance available.

F & C vigorously insists that its policy is void *ab initio* for material misrepresentation anyway because Synalloy failed to disclose to F & C before issuance of the policy the existence of the 1982 Letter of Agreement reached by Synalloy and General Accident. This agreement, according to F & C, substantially increased its potential liability in that, by waiving Exclusion (e) under its policy, General Accident increased its liability and consequently the potential that the underlying insurance would be exhausted, placing the risk on excess carriers earlier then it would be otherwise. A misrepresentation or concealment of facts which is material to the insurer's acceptance of the risk or which, if known, would have precluded issuance of the policy, will prevent a recovery under the policy. *Casey Enterprises v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981); O.C.G.A. § 33–24–7. A material misrepresentation is one which would be a consideration in an insurer's decision to issue a policy. 655 F.2d at 602; *Bourne v. Balboa Ins. Co.*, 144 Ga.App. 55, 57, 240 S.E.2d 261 (1977). Although the Court finds it difficult to understand how the waiver of Exclusion (e) for policies in effect from January 1, 1967 to January 1, 1973

could increase the risk for an insurer who is an excess carrier above the limits of the policy in effect from January 1, 1982 to January 1, 1983, the allusion in the Affidavit of Max Fuentes, III [attached to F & C's brief in opposition to Synalloy's motion] to risks arising from "the technical provisions of the letter agreement relating to the retrospective allocation of claims during various periods of time" suffices to convince the Court to defer making any ruling on the issue of material misrepresentation other than to note that it represents an additional reason to deny summary judgment against F & C.

### V. Synalloy vs. Continental Reprise

The question upon which hinges Continental's current duty to defend—whether there is other insurance in any way applicable—cannot be answered in this Order. The Court can say neither that there is nor that there is not other applicable insurance. Further development of the record will provide this answer.

Synalloy contends that the other insurance aspect of Continental's policies should be declared of no effect inasmuch as reading such provisions in conjunction with other insurers' policies which contain other insurance clauses would result in the absurdity that no insurer is obligated to indemnify or defend. It is certainly true that in some cases other insurance clauses may be deemed inoperative if they conflict with provisions of other policies. *See State Farm Fire & Cas. Co. v. Holton*, 131 Ga. App. 247, 205 S.E.2d 872 (1974). In the instant case, however, that situation has not yet arisen and the Court will not predict that the situation will arise, particularly where the problem of mutually repugnant other insurance clauses may be avoided, depending upon the outcome of the factual inquiry into the existence of other insurance in any way applicable.

Partial summary judgment against Continental is therefore denied.

---

**14.** According to Synalloy's reply brief, General Accident has denied coverage under its 1982 policies based on the policy language and the 1982 Letter Agreement. The Court can find no evidence in the record to verify these assertions. General Accident did deny coverage under its Comprehensive General Liability policies in effect after January 1, 1973.

## VI. Summary

Based on the foregoing discussion, the motions of Synalloy for partial summary judgment against General Accident and Continental and for summary judgment against First State and F & C are hereby DENIED. Judgment shall be entered accordingly.

In considering these motions, the Court has reached some conclusions, both legal and factual, which will have a bearing on the course of action taken by the insurers, depending upon the resolution of certain issues. General Accident's duty to defend new BNA claims or to continue defending pending BNA claims will have to be assessed if and when its policy limits of liability are exhausted. Of course, the most notable outstanding issue with respect to the extent of General Accident's duty to defend concerns the amount of its limits of liability. Until such time as General Accident may relinquish the defense of the tort claims, it has the primary duty to conduct a defense. However, in those cases as to which General Accident has denied coverage and as to which it later denies coverage based on justifiable refusal to defend because of exhaustion of policy limits (if such occurs), the duty of excess carriers to defend is triggered. Continental will have a current duty to defend BNA claims for which coverage has been denied by the primary insurer, despite Continental's uncertainty over its coverage of these claims, if there is no other insurance in any way applicable. If there is some other insurance, *e.g.*, First State's coverage and defense of mental injury claims, it must be determined whether First State's coverage and defense of one theory of recovery constitutes "other insurance in any way applicable." In other words, the language of Continental's policy will have to be interpreted in accordance with the rules of contract construction if other insurance is found to exist. If there is no other insurance, Continental's duty to defend becomes immediately enforceable. Whether First State has a duty to defend and indemnify Synalloy against the mental injury claims depends upon the existence or lack of underlying insurance. Numerous issues remain to be decided with regard to F & C's duties of defense and indemnity, if any.

The Court is not concerned with the logistics of providing Synalloy with a complete defense. The Court's concern in this declaratory judgment action is that each insurer who is found to owe a duty of defense and/or indemnity to Synalloy fulfill its obligations. The logistics will be left to the contracting parties.

## VII. Conclusion

I have endeavored to restrict the foregoing discussion to the ripe issues raised by these motions. Careful scrutiny of the insurance contracts, of the parties' arguments and of the law has revealed the complex and intricate network of legal and factual issues presented to the Court in this declaratory judgment action. This not-unexpected revelation has prompted the Court to voice its doubts about the wisdom of Synalloy's tactical decision to seek early and summary adjudication with respect to some of the themes which pervade this litigation. Of particular concern is the danger of prejudicing a litigant not party to these motions whose position may not yet have solidified. In order to alleviate any threat of such prejudice, the Court will, when and if so required, consider the potential effect of its rulings herein on defendants not party to these motions.

The Court is not unsympathetic with Synalloy's position. Despite its purchase of numerous forms and amounts of insurance, it has been faced with the prospect of having to fight for the very coverage to which it quite understandably believed it was entitled. However, the hard and sometimes ugly facts of industrial life cannot be avoided. One of them is potentially ruinous liability to employees injured by occupational disease. Another is that insurance companies are often "uncertain" about their obligations in such a situation. There is a forum for the resolution of all of the questions raised by the insured and its insurers, and there is a means by which obligations may be enforced. Such is the purpose of this declaratory judgment action.

The Court will expect rigorous preparation for the trial of this case: stipulation of

facts, narrow and precise characterization of issues and careful organization of testimony and evidence. The goal, as the Court sees it, is to reach a workable interpretation of the insurance policies which comports with the reasonable expectations of the contracting parties when they entered into agreements for indemnity and defense.